892 F.2d 1522
 29 Fed. R. Evid. Serv. 1330
 FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate
capacity, Plaintiff-Appellee, Cross-Appellant,
v.
Anthony MARINA, Jorge De La Torriene, Miami Equity
Corporation, Cubico, Ltd., Inc. and Ramon Milian
Rodriguez, Defendants-Appellants, Cross-Appellees.
 No. 88-5525.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 29, 1990.
 
 Jeffrey M. Weissman, Ft. Lauderdale, Fla., for defendants-appellants-cross-appellees.
 Patricia H. Thompson, Kimbrell & Hamann, Miami, Fla., for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the Southern District of Florida.
 Before VANCE* and COX, Circuit Judges, and CAMP**, District Judge.
 PER CURIAM:
 
 
 1
 Defendants Anthony Marina, Jorge De La Torriene, Ramon Rodriguez, Miami Equity Corporation, and Cubico LTD (collectively the Borrowers) appeal a final judgment entered on a jury verdict in favor of the Federal Deposit Insurance Corporation (FDIC). The FDIC cross-appeals the district court's denial of its motion for a directed verdict on an issue decided favorably to the borrowers. For reasons set forth below, we affirm in part and reverse in part.
 
 I. BACKGROUND
 
 2
 The facts underlying this case are essentially undisputed. In 1981, the Union Trust Company Bank of Puerto Rico (Union Trust) loaned defendant Miami Equity Corporation (Miami Equity) $214,048.00. Miami Equity in turn executed and delivered to Union Trust two promissory notes evidencing this indebtedness. Shortly thereafter, in substitution of these notes, Miami Equity executed a consolidated mortgage note for this sum. The new note was secured by a second mortgage on property located in Dade County, Florida. Additionally, $200,000.00 of the Miami Equity obligation was personally guaranteed by defendants Cubico, Marina, Torriene, and Rodriguez. The notes provided for an annual interest rate of "pr + 2%"; the parties agree that this was an abbreviation for "prime plus 2%". Approximately two years after execution of the mortgage, Union Trust and Miami Equity executed an agreement releasing the Dade County property from the lien of the mortgage and substituting other realty as collateral.
 
 
 3
 In 1982, Union Trust loaned Marina $100,000.00 (Marina obligation) and Torriene $100,000.00 (Torriene obligation). Marina and Torriene in turn executed and delivered promissory notes to Union Trust reflecting this indebtedness. Both notes also indicated an annual interest rate of "pr + 2%". The Marina obligation was guaranteed by defendants Cubico and Torriene, and the Torriene obligation was guaranteed by Marina and Cubico.
 
 
 4
 In December 1983, the Secretary of the Treasury of Puerto Rico determined that Union Trust was financially unsound. Accordingly, the Secretary closed the bank and tendered to the FDIC the appointment as the bank's receiver, which the FDIC accepted pursuant to 12 U.S.C. § 1821(e).[1] As receiver, the FDIC froze approximately $160,000.00 of Cubico funds deposited with Union Trust on grounds that the above loans were past due. Six months later, these funds were applied to the outstanding principal and interest balances on the obligations, making the interest payments on all three obligations current and reducing the outstanding principal amounts of the Marina and Torriene notes to $36,536.80. The FDIC in its corporate capacity then purchased from the FDIC in its receivership capacity certain assets of Union Trust. Among the assets acquired were the debts of the borrowers as of the date of the bank's closing plus interest and attorneys' fees.
 
 
 5
 The FDIC in its corporate capacity subsequently filed this suit in the district court against the borrowers to collect these debts. The borrowers asserted that the Secretary failed to comply with Puerto Rican law in closing Union Trust, thus violating the bank's constitutional and statutory rights. The borrowers also interposed several affirmative defenses, including the defense that Cubico's guaranties on the Miami Equity obligation were released pursuant to an accord and satisfaction between Union Trust and Cubico, and the defense that "prime plus 2%" was an ambiguous term because Union Trust never had a discernible "prime rate."[2]
 
 
 6
 The district court granted the FDIC's motion for summary judgment on the illegal takeover defense; the accord and satisfaction and the prime rate issues were submitted to the jury via a special verdict form. The jury found that there was no "accord and satisfaction between the Union Trust Company and the defendants whereby the parties agreed pursuant to the Hypothecation Agreement to release the defendants from their guarantees on the $200,000 Miami Equity Corporation loan." R5-132-1 (quoting the special verdict form). The jury also found that the rate of interest designated on the notes was not tied to the New York prime rate of interest, as the FDIC had contended. The district court accordingly entered a final judgment directing the borrowers to pay the principal amounts due on the obligations, plus the prejudgment interest remaining unpaid at the Puerto Rican statutory rate to the date of judgment, and attorneys' fees. The final judgment also authorized the FDIC to foreclose its mortgage on the encumbered property. The borrowers filed the instant appeal, asserting the following bases for reversal: 1) the district court erred in granting the FDIC's motion for summary judgment on the illegal takeover defense; 2) the district court erred in precluding certain testimony concerning the alleged accord and satisfaction, thus handicapping the borrowers in their presentation of this defense; and 3) that in light of the jury's finding on the prime rate issue, the district court erred in calculating the rate of interest from the date of default rather than from the date of execution of the notes and in denying the borrowers credit for interest payments made at the illusory interest rate. The FDIC cross-appeals, contending the district court erred in denying its motion for a directed verdict on the prime rate issue. Each argument will be addressed seriatim.
 
 II. DISCUSSION
 A. Illegal Takeover Defense
 
 7
 Shortly after the Secretary of the Treasury closed Union Trust and appointed the FDIC its receiver, the bank filed suit against the Secretary, the FDIC, and another bank involved in the purchase and assumption transaction in the Superior Court of Puerto Rico. Union Trust charged that the Secretary had violated Puerto Rican law in taking over the bank,[3] depriving the bank of its property without due process of the law. Union Trust sought both an injunction and judicial review of the administrative decision to place the bank in receivership. The territorial judge determined that the Secretary had indeed closed the bank without the hearing provided by Puerto Rican law and remanded it to the Department of the Treasury with orders to conduct an administrative proceeding with such a hearing. The record does not indicate the outcome of this action.
 
 
 8
 Based on this proceeding in the Superior Court of Puerto Rico, the borrowers contend that the takeover of Union Trust and the subsequent transfer of its assets to the FDIC as receiver was illegal. The borrowers argue that this illegal acquisition bars the FDIC in its corporate capacity from suing on the instruments and guaranties. The district court granted the FDIC's motion for summary judgment on this issue, holding that the borrowers lacked standing to assert this defense and that any impropriety of the FDIC as receiver did not "affect the FDIC's attempts to collect on notes and guaranties they purchased in their corporate status from the receivership." R4-100-4.
 
 
 9
 We affirm the district court's holding on this issue, particularly in light of our recent decision in Federal Deposit Insurance Corp. v. Morley, 867 F.2d 1381 (11th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 75, 107 L.Ed.2d 41 (1989). Like the present case, in Morley the borrower executed a promissory note and a mortgage to an insured bank that later experienced severe financial difficulties. The FDIC adopted a financial assistance program to revitalize the bank. As part of this program, the FDIC acquired the bank's loan to the borrower. When the FDIC sued to collect the overdue debt, the borrower counterclaimed that the FDIC's financial assistance program failed to comply with 12 U.S.C. § 1823(c) (Supp.1988). We affirmed the district court's summary judgment barring this counterclaim and held that the borrower lacked standing to challenge the program's validity under section 1823(c). Particularly relevant for purposes of this appeal, we determined that the borrower had not "alleged a judicially cognizable injury," a requisite constitutional component of the standing doctrine. Id. at 1387. Although we focused on another specific provision of the Federal Deposit Insurance Act (FDIA), 12 U.S.C.A. §§ 1811-1831k (1980 & Supp.1989), we also determined that a borrower of an insured bank falls outside the zone of interests protected by the FDIA, as the FDIA was enacted to protect depositors and bank shareholders rather than the debtors of insured banks. The borrower thus also failed to satisfy this requisite prudential component of the standing doctrine.
 
 
 10
 Although the borrowers in the instant case challenge the validity of the FDIC's receivership under a different provision of the FDIA, our reasoning in Morley is nevertheless applicable here. The borrowers have not even attempted to allege an injury in this case, and while we could possibly conceive of one, we decline to bear the borrowers' burden for them. Moreover, even if the borrowers could satisfy the constitutional components of the standing doctrine, Morley instructs that prudential considerations counsel against the borrowers' standing to challenge the legality of the FDIC's receivership: as debtors of the insured bank, they fall outside the zone of interests protected by the FDIA. See also Note, Creditors' Remedies Against the FDIC as Receiver of a Failed National Bank, 64 Tex.L.Rev. 1429 (1986) (explaining generally that "the laws that designate the Federal Deposit Insurance Corporation as receiver of any closed national bank exist because of congressional concern for the protection of depositors and other creditors").
 
 B. Accord and Satisfaction Defense
 
 11
 At trial, the borrowers attempted to prove that Union Trust released certain guaranties prior to its closing by virtue of an accord and satisfaction. The borrowers introduced an hypothecation agreement as evidence of this accord and satisfaction[4] and presented testimony to the effect that they complied with its terms. The borrowers also introduced testimony to the effect that this agreement could be asserted against the FDIC in its corporate capacity because it satisfied the requirements of 12 U.S.C. § 1823(e). The FDIC, in turn, contended that the borrowers had fabricated this agreement and that even if such an agreement existed, section 1823(e) precluded the borrowers from asserting it against the FDIC in its corporate capacity because the agreement was not signed by Union Trust and because it was not present in the bank's records at the time of closing. Both issues were submitted to the jury, and the jury found that there was no accord and satisfaction. The jury thus did not reach the question of whether this defense could be asserted against the FDIC under section 1823(e).
 
 
 12
 On appeal the borrowers assert that several improper evidentiary rulings of the district court prejudiced their presentation of this defense. They primarily contend that the district court erred in excluding the testimony of Union Trust's former president as to the nature of the dispute giving rise to the accord and satisfaction.[5] More specifically, the borrowers sought to introduce this witness's explanation that Union Trust executed the hypothecation agreement because they were informed and believed that certain Small Business Administration (SBA) regulations made the Cubico guaranty unenforceable. The district court excluded this testimony as hearsay and barred by section 1823(e).
 
 
 13
 We disagree and hold that neither the hearsay rules nor section 1823(e) bar this testimony. The witness's statements were not offered for their truth--that is, they were not offered to establish that Cubico's guaranty was unenforceable due to certain SBA regulations. Instead, the proffered testimony was offered to show that the parties believed that the validity of some of the guaranties was subject to question and that they entered into an accord and satisfaction because of this belief. Accordingly, the statements were not hearsay. See Fed.R.Evid. 801. The record reveals that this evidence was not cumulative. Because the jury was instructed that the parties must have intended to effect the settlement of an existing dispute in order for borrowers to prevail on this accord and satisfaction defense, consideration of this witness's testimony was essential in determining this issue. Unless the evidence was inadmissible on some other ground, see Metallurgical Industries, Inc. v. Fourtek, Inc., 790 F.2d 1195, 1207 (5th Cir.1986), this error was harmful and the district court abused its discretion in barring it.
 
 
 14
 It is thus necessary to determine if the district court erred in holding that 12 U.S.C. § 1823(e) barred this testimony. The FDIC asserts that under Langley v. Federal Deposit Insurance Corp., 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), this oral testimony is "part and parcel" of the purported accord and satisfaction agreement and therefore barred for failure to meet the requirements of section 1823(e). We disagree.
 
 Section 1823(e) provides:
 
 15
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition or the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 
 
 16
 12 U.S.C.A. § 1823(e) (1980 & Supp.1989). The FDIC correctly argues that the admissibility of this evidence under section 1823(e) hinges on whether it constitutes an "agreement" or part of the alleged accord and satisfaction "agreement" between the borrowers and the closed bank. If so, the oral testimony is inadmissible for failing to meet the statute's requirements. The FDIC also correctly asserts that Langley provides guidance on this issue. In Langley the FDIC in its corporate capacity brought suit to collect on a note acquired from a failed bank, and the borrowers defended on the ground that the note had been procured by fraud in the inducement. Specifically, the borrowers maintained that the bank had misrepresented the size of the property the borrowers were purchasing and the fact that there were outstanding leases on the property. The alleged representations did not appear in any of the borrowers' documents, the bank's records, or the board of directors' minutes. The question thus presented to the United States Supreme Court was whether the term "agreement" in section 1823(e) included a condition to payment of a note--even if this condition is the truthfulness of an express warranty. The Court answered in the affirmative, establishing that the term "agreement" was to be liberally construed in accordance with the purposes of section 1823(e).
 
 
 17
 Even a liberal interpretation of this term, however, would not include the evidence in question in this case within its meaning. The alleged hypothecation agreement was the "agreement" between the bank and the borrowers and therefore subject to the requirements of section 1823(e). The borrowers sought merely to explain briefly why the parties executed this hypothecation agreement. If the jury found that the parties had indeed executed the agreement releasing certain guaranties, then the jury would have had to consider whether the agreement satisfied the requirements of section 1823(e). Similarly, the facts giving rise to the witness's state of mind in authorizing the execution of the alleged hypothecation agreement are not such an integral part of the hypothecation agreement to require their inclusion in its written terms. In no way were these surrounding circumstances "conditions" upon the parties' performances under the hypothecation agreement. If the Cubico guaranty were later determined to be in compliance with the SBA regulations, the terms of the hypothecation agreement would still be in effect.
 
 
 18
 We further note that the admission of such testimony would not defeat the purposes of section 1823(e). The Langley Court explained that section 1823(e) serves two purposes. First, the statute allows "federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets" when evaluating the bank's fiscal soundness. Id. 108 S.Ct. at 401. Second, it "ensure[s] mature consideration of unusual loan transactions by senior bank officials, and prevent[s] fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Id. The proffered testimony is not contrary to the written records of the closed bank and would neither impede the examiners' evaluation nor allow the insertion of new terms into a loan agreement. Again, neither party disputes that the alleged hypothecation agreement, if found to exist, would be subject to the statute.
 
 
 19
 The district court thus erred in barring the testimony under section 1823(e) and the hearsay rules. As noted above, because consideration of this testimony was vital in determining whether the parties entered into the hypothecation agreement to effect the settlement of an existing dispute--the first prerequisite in proving the existence of an accord and satisfaction--the district court's error resulted in substantial harm to the borrowers. Accordingly, we reverse and remand for a new trial with instructions to the court below to admit the proffered testimony into evidence. Upon retrial, the FDIC should request a limiting instruction in a timely manner to assure that such evidence is not admitted for the truth of the matter asserted in violation of Fed.R.Evid. 802. See United States v. Garcia, 530 F.2d 650, 656 (5th Cir.1976) (Under Fed.R.Evid. 105, defendant must request the court to instruct the jury that hearsay was to be used only for impeachment purposes; there is no duty to give instructions sua sponte.); see generally 1 J. Weinstein & M. Berger, Weinstein's Evidence, p 105 (1988).
 
 C. Prime Rate Issue
 
 20
 The second issue submitted to the jury in this case was whether the rate of interest on the borrowers' notes--"prime plus two percent"--referred to the prime rate of interest charged by certain New York banks. The jury determined that this rate of interest was not tied to a New York rate in this way, and accordingly, the district court entered a judgment requiring the borrowers to pay Puerto Rico's statutory six percent interest rate on the obligations. The FDIC cross-appeals, contending the district court erred in denying its motion for a directed verdict on this issue. Specifically, the FDIC maintains that the meaning of the term "prime" was unambiguous and enforceable as written in the instruments--that it referred to the prime interest rate charged by certain New York banks. The FDIC points out that from the date of the notes' execution in 1981 until the date of default in 1984, Union Trust calculated and charged the borrowers this prime rate plus two percent and that the borrowers paid this amount without protest. The FDIC further points out that its witness, who was quite familiar with commercial lending in Puerto Rico, testified that every Puerto Rican bank uses this prime rate. Finally, Union Trust's loan policy manual provided that the bank gears its prime rate to the "average industry prime," which the FDIC witness explained meant the prime rate charged by the New York banks. According to the FDIC, the district court violated section 1823(e) and precedent of this circuit in permitting the borrowers to introduce extrinsic oral testimony to alter the meaning of this term and create ambiguities in the instruments in question.
 
 
 21
 As established in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969) (en banc), in determining whether the district court erred in denying the FDIC's motion for a directed verdict, we should consider all the evidence in the light most favorable to the parties opposing the motion, the borrowers. We then ask whether reasonable persons could have reached different conclusions based on the evidence submitted. If there is substantial evidence opposed to this motion, the motion should be denied. Id.; see also United States v. Davis, 809 F.2d 1509, 1512-13 (11th Cir.1987).
 
 
 22
 Applying this standard and considering all the evidence in the record, we hold the district court properly denied the FDIC's motion for a directed verdict and committed no error in sending this issue to the jury. The borrowers' chief witness, the former president of Union Trust, flatly contradicted the statement that Union Trust selected its prime rate based upon the rates of other banking institutions. He also contradicted the statement that all Puerto Rican lending institutions have the same prime rate. He testified that there are at least two prime rates in Puerto Rico and that there are many occasions when Puerto Rican banks and United States banks have different interest rates. On cross-examination, the FDIC witness admitted that nowhere in the bank's loan manual does it define "average industry prime" by reference to New York banks. Moreover, Mr. Marina, a borrower who was also one of the directors of Union Trust, testified that Union Trust did not have a prime rate of interest. There thus existed substantial evidence opposing the FDIC's position that "prime" referred to the prime rate set by various New York banks, and the issue was properly submitted to the jury.
 
 
 23
 The FDIC's argument that such a holding defies the case law of this jurisdiction is without merit. In Federal Deposit Insurance Corp. v. Merchants Nat'l Bank of Mobile, 725 F.2d 634 (11th Cir.1984), cert. denied, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984), we held that a borrower could not resort to evidence that did not meet section 1823(e)'s requirements to create an ambiguity in a failed bank's books and records when the fact of these records was clear and unambiguous. In the instant case, however, the records of Union Trust do not unambiguously define the meaning of the term "prime." Indeed, our review of the record indicates that the bank's loan manual was the only written record that attempted to define this term,[6] and this purported definition--that Union Trust's prime is geared to the "average industry prime"--is most unilluminating. Both parties could thus properly resort to oral testimony to define this ambiguous term.
 
 
 24
 We further note that the First Circuit's opinion in Federal Deposit Insurance Corp. v. La Rambla Shopping Center, 791 F.2d 215 (1st Cir.1986), comports with our reasoning. Like the instant case, in La Rambla the FDIC in its corporate capacity sued to collect on an instrument it acquired from a failed bank. This note provided that after a certain date, the borrower would pay an interest rate of " 'prime rate plus 3 percent with a floor of 10.5 percent.' " Id. at 221 (quoting the parties' agreement). The borrower defended, inter alia, that the record lacked evidence defining the term "prime rate" and that there was thus no way of calculating the interest due. The First Circuit summarily rejected this defense, stating that both testimony and documentary evidence showed that the failed bank's prime rate was the same one used by a leading New York bank. La Rambla thus demonstrates that the meaning of "prime rate" is a question of fact to be resolved on the basis of testimony and documentary evidence presented in the trial court. See also Kleiner v. First Nat'l Bank of Atlanta, 581 F.Supp. 955 (N.D.Ga.1984) (holding that a note's interest rate of a certain amount "plus the 'prime rate' currently charged from time to time by [the Bank] to its best and most credit worthy customers" fails to evidence what the parties intended the prime rate to be and thus was a question of fact for the jury to determine.).
 
 D. Credit for Interest Payments
 
 25
 In light of the jury's finding on the above issues, the district court entered a judgment awarding the FDIC the amount of principal due on the borrowers' obligations[7] with interest at the 6% statutory rate from the date of default until the date of entry of the judgment. The district court also awarded the FDIC attorneys' fees equal to ten percent of the outstanding balance due on the borrowers' obligations, as provided for in all of borrowers' promissory notes. Both parties agree that this is the applicable statutory rate of interest and that the FDIC was entitled to attorneys' fees as provided for in the instruments. The borrowers contend the district court erred, however, in failing to deduct excessive interest payments made by the borrowers at the higher, illusory New York prime rate prior to the date of default. In essence, the borrowers want the district court to recalculate the interest due on their obligations--to the time of the execution of the promissory notes--and offset any interest payments which were in excess of the statutory rate. The borrowers also contend that any adjustment in the amount of the balance due would also require an adjustment in the award of attorneys' fees to the FDIC.
 
 
 26
 The district court did not err in refusing to award the borrowers credit for excessive payments made at the illusory rate of interest. The borrowers made several interest payments voluntarily and without protest. These voluntary payments, made with full knowledge of all the facts, cannot be recovered merely because at the time of payment, the borrowers misapprehended their legal rights relative to the interest due. See, e.g., Jefferson County v. Hawkins, 23 Fla. 223, 2 So. 362 (1887); Kirk v. Allegheny Towing, Inc., 620 F.Supp. 458 (D.C.Pa.1985). Accordingly, the district court's holding on this issue is affirmed, and no adjustment in the award of attorneys' fees is necessary.
 
 III. CONCLUSION
 
 27
 For the reasons set forth in Section II B, we reverse and remand for a new trial solely on the accord and satisfaction issue.[8] We affirm the district court on all other issues raised in this appeal.
 
 
 28
 AFFIRMED in part, REVERSED and REMANDED in part, with instructions.
 
 
 
 *
 Judge Robert S. Vance concurred in this opinion prior to his death on December 16, 1989
 
 
 **
 Honorable Jack T. Camp, U.S. District Judge for the Northern District of Georgia, sitting by designation
 
 
 [1]
 12 U.S.C.A. § 1821(e) (1980) provides:
 Whenever any insured State bank (except a District bank) or any insured branch (other than a Federal branch) of a foreign bank shall have been closed by action of its board of directors or by the authority having supervision of such bank, as the case may be, on account of inability to meet the demands of its depositors, the Corporation shall accept appointment as receiver thereof, if such appointment is tendered by the authority having supervision of such bank and is authorized or permitted by State law. With respect to any such insured State bank or insured branch of a foreign bank, the Corporation as such receiver shall possess all the rights, powers and privileges granted by State law to a receiver of a State bank.
 The term "State bank" includes a bank that is incorporated under the laws of Puerto Rico. 12 U.S.C.A. § 1813(a) (1980 & West Supp.1989).
 
 
 [2]
 The borrowers also asserted the instruments sued upon were not in default because Union Trust and the borrowers had agreed to extend and renew them, that the FDIC in its receivership capacity had wrongfully seized Cubico's funds on deposit at Union Trust and misapplied them to other debts not guaranteed by Cubico, and that the interest charged on the notes exceeded the usury limits permitted by the laws of Puerto Rico. The district court granted summary judgment in favor of the FDIC on these defenses, and the borrowers do not challenge this ruling on appeal
 
 
 [3]
 Specifically, Union Trust contended that the Secretary had violated P.R. Laws Ann. tit. 7, § 491 (1982), which provides:
 If in consequence of an examination made or a report from an examiner, the Secretary of the Treasury of Puerto Rico should have reason to believe that a trust company is not in a sound financial condition to continue doing business, or that its affairs are conducted in such manner that the public or the persons or firms having funds or securities under its custody are in danger of being defrauded, he may, after hearing the trust company, recommend to the Secretary of Justice that he institute proper action or proceedings to the end that the trust company may be declared in a state of liquidation, or that it may be placed under receivership, as the Secretary of the Treasury of Puerto Rico may deem best, and the Secretary of Justice is hereby authorized and directed to act in accordance with the recommendations of the said Secretary of the Treasury of Puerto Rico.
 
 
 [4]
 This agreement recites that upon the hypothecation of $350,000.00 in certificates of deposit (CD's), the guarantees on the Miami Equity obligation would be cancelled; upon the improvement of Union Trust's position with respect to the mortgaged property from a second to a first mortgage, the CD's would be released
 
 
 [5]
 The borrowers also contend the district court erred in allowing the FDIC's witness, an assistant liquidator with the FDIC, to describe the FDIC's standard procedures at a bank closing. This argument is without merit
 
 
 [6]
 At oral argument the FDIC also emphasized that the bank's written records reflected that the borrowers made several interest payments prior to the date of default at the New York rate. The FDIC maintains that this record of payments also constitutes a written record defining "prime rate" in accordance with New York standards. This argument is of no merit. The fact that a bank charged a certain rate of interest does not prove that this is the rate of interest legally borne by the instruments
 
 
 [7]
 The district court granted the FDIC a directed verdict on the amount of principal due by the borrowers after the jury determined that the borrowers had not been released from their obligations
 
 
 [8]
 This court has the authority to restrict the issues to be heard on retrial. See Great American Indemnity Co. v. Ortiz, 193 F.2d 43 (5th Cir.1951)