**HOSPITAL COMPUTER SYSTEMS, INC., Plaintiff,**

v.

**The STATEN ISLAND HOSPITAL, Defendant.**

Civ. A. No. 89–2305.

United States District Court, D. New Jersey.

April 1, 1992.

---

**1354**

Joseph R. McDonough, Ribis, Graham & Curtin, Morristown, N.J., Barry R. Ostrager, Brian G. Snover, Nina J. Spiegel, Jennifer L. Klein, Simpson, Thacher & Bartlett, New York City, for plaintiff.

James B. Daniels, Friedman Siegelbaum, Roseland, N.J., for defendant.

WOLIN, District Judge.

This action arises from a contract entered into between Hospital Computer Systems, Inc. ("HCS") and Staten Island Hospital ("SIH") on September 26, 1985 ("the Agreement"). Under the Agreement, HCS agreed for a fee to provide SIH with computer software development and management services to create for SIH a custom computerized billing and accounting software system. HCS filed the complaint in this action in 1989, alleging that SIH breached the Agreement. SIH has asserted six counterclaims, three of which sound in breach of warranty and three of which sound in tort. Before the Court is HSC's motion for summary judgment as to all of those counterclaims.[1] For the reasons that follow, HCS's motion will be granted as to the tort counterclaims and granted in part and denied in part as to the breach of contract counterclaims.

### BACKGROUND

Sometime during the period 1982–83, SIH hired a computer consultant, Libra Health Technologies, Inc. ("Libra"), to assist in SIH's search for a computerized patient accounting and billing system to replace its existing computer system. Libra helped SIH to create a "request for proposals" that was distributed to a number of computer system vendors to solicit bids for a new computer system.

After all bids had been received, SIH narrowed its consideration to three vendors, one of which was HCS. In a report dated November 30, 1983, Libra advised SIH that, of the three vendors under consideration, HCS's was least suited to the needs of SIH. SIH attempted, but failed, to negotiate and execute a contract with one of the other two vendors.

Two years later, in 1985, SIH again contacted HCS. During negotiations, HCS represented to SIH that its system could meet the reporting requirements of New York state regulators and health care insurers, and could be customized to meet SIH's other needs. Ultimately, the parties entered into the Agreement on September 26, 1985. Under the Agreement, in consideration of services to be provided by HCS

---

1. The Court notes that HCS's Reply Brief exceeds by 10 pages the Local Rule page limitation of 15 pages imposed on such briefs. *See* Local Rule 27 B (amended September 3, 1991). Unlike SIH, which asked for and received leave to file an overlength opposition brief, HCS neither requested nor received permission to file an overlength reply. In the future, the Court expects counsel for HCS to comply with the Local Rules or risk having their briefs rejected.

to develop and implement the system, SIH was to pay in excess of $20,000 per month as a "management fee".

On January 1, 1986, SIH "went live" with the HCS system. The system, which processed and stored data offsite through telecommunications lines, had many problems which HCS continually endeavored to correct. Over the next eighteen months, SIH paid in full the monthly management fee due under the contract. Apparently, the system continued to suffer from numerous defects during this entire period. Weekly meetings were held between SIH and HCS to discuss the ongoing problems. Problems with the system were compounded by changes in New York regulatory requirements imposed on SIH, which had to be incorporated into the HCS system on an ongoing basis. Not satisfied with the system's or HCS's performance, SIH hired an independent computer consultant, L.H. Titterton, Inc. ("Titterton") in late 1986 or early 1987 to evaluate the HCS system. After it completed a study of the system, Titterton concluded that the system's problems could not be fully remedied.

A luncheon meeting between SIH and HCS was arranged for May 22, 1987 by SIH's senior vice president Edward Messier. That meeting was attended by Messier, Gerald Ferlisi (SIH's vice president of finance), Lewis Titterton, and Joseph Fahey (HCS's president). At the meeting, the parties discussed: (1) SIH's dissatisfaction with the performance of the HCS system; (2) SIH's decision to merge with Richmond Memorial Hospital and its consequent need to consolidate the two hospitals' computer systems; (3) SIH's decision to try to obtain another computer system rather than to continue trying to make the HCS system work properly; (4) SIH's desire that SIH and HCS attempt to part ways amicably and that HCS assist in the transition to a new system; and (5) SIH's offer to consider a proposal by HCS for a "wind-down fee".[2]

Messier confirmed the contents of the meeting discussions in a letter to Fahey dated June 2, 1987. Part of that letter stated:

> Because of various reasons associated with our current and past relations with HCS and our dislike of [Richmond Memorial's system], we have decided to wipe the slate clean and try another vendorized financial system.
>
> While I have not been personally involved with the HCS implementation over the last 18 months, the lack of accurate and timely responsiveness to our needs, as well as an attitude of non-cooperation with our personnel have been routine reports at my internal management sessions. The loss of revenues and additional costs to the Hospital have been major and significant. Without repeating all my verbalization at our luncheon, suffice to say we would like to accomplish a reasonable and orderly transition from HCS to whatever our new system would be. As you have indicated at our recent meeting, given our basic decision you also subscribe to this same approach toward a planned HCS withdrawal. I am also aware that working at The Staten Island Hospital has been difficult for HCS due to our LAN approach to hospital data processing, as well as our ever-changing New York State requirements placed upon the hospital. It is not the intent of the hospital that HCS should be asked to absorb significant financial losses as a result of the consolidation process and our new system needs. Without making a specific commitment, I would appreciate your letting me know what kind and how much of a financial burden our contract has been to HCS.
>
> Our preliminary plans call for a replacement of the general ledger system and

---

2. The parties have each selectively set forth in affidavits those topics of discussion at the meeting that may be favorable to them, but have not objected to or otherwise disputed those topics of discussion that the other party has set forth. For example, in its briefs and affidavits, HCS has not mentioned that SIH's dissatisfaction with the HCS system was discussed at the meeting, but has not disputed SIH's evidence that this was discussed. Hence, it is undisputed on this motion that all five topics were discussed at the meeting.

certain billing and accounting systems at the Staten Island division by year end 1987. The remainder of the HCS systems will be phased out over 1988. This timetable is subject to modification and may result in most transitions of billing occurring in 1988. We need to plan these activities with you. HCS should continue to maintain and complete installation of any applications in process. No new applications will be started.

I know that this decision comes to HCS suddenly but the problems of to [sic] your organization implementing HCS programs at the Staten Island Hospital must be well known to your staff. Your amicable and controlled reaction to our decision is reflective of the character of yourself and your company. I'm grateful that we will part company in this environment.

Mr. Titterton will be in contact with you to work out more specific work plans and timetables....

(Exhibit A, Fahey Affidavit).

In response to discussions at the meeting and to Messier's letter, Fahey wrote a letter to Messier dated June 11, 1987 in which he stated

We have received your letter of June 2, 1987. As you know, our contract with the Staten Island Hospital has a five year term which commenced on the initial implementation date, January 1, 1986. Hospital Computer Systems has complied with its obligations under the contract, and we fully expect The Staten Island Hospital to comply with its obligations. However, we would be pleased to discuss with you some type of prepayment arrangement in the event you wish HCS to release the data to your new consultant.

(Exhibit B, Fahey Affidavit). In a letter to Lewis Titterton dated July 2, 1987, Joseph Manzi, vice president of HCS, wrote

HCS is willing to provide the following relief to Staten Island Hospital if it chooses to stop using the software services prior to the expiration of our contract:

*Monthly Fee*—Reduction of $2,500. monthly beginning with the cutover to a new system. The balance of the fee will be due monthly through the expiration of the contract.

*Consultation Fee*—HCS offers to assist in conversion with meeting time not to exceed 50 hours for a total of a $50,000. one time fee. Time spent in excess of 50 hours would be charged at $100. per hour.

(Exhibit C, Fahey Affidavit).

SIH did not respond to either the June 11 or July 2 letter. Instead, it continued to make payment in full each month under the contract for the next eighteen months. Unbeknown to HCS, during those eighteen months, SIH sought out, procured, and implemented a new computer system from Travenol Healthcare Information Services ("the Baxter system").

When the Baxter system became operational on February 1, 1989, SIH terminated its use of the HCS system, without prior notice to HCS, by disconnecting the telecommunications access line between the hospital and HCS's offsite data processing equipment. SIH also suspended all further payments of the monthly management fee and offered to return to HCS equipment located on site at the hospital. HCS commenced this breach of contract action in May 1989.

## DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons,* 871 F.2d 409, 419 (3d Cir.1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.*

### B. *Waiver*

HCS contends that, as a matter of law, SIH waived its right to seek damages for breach of the Agreement. HCS specifically asserts that, by accepting HCS's performance under the Agreement, and by paying the full monthly management fee for three years, while knowing of HCS's alleged breaches under the agreement, HCS waived its right to claim that HCS breached the contract.

■ Under New York law [3] "[w]aiver is an intentional relinquishment of a known right and will not be lightly presumed." *Gilbert Frank Corp. v. Federal Ins. Co.,* 70 N.Y.2d 966, 968, 525 N.Y.S.2d 793, 795, 520 N.E.2d 512 (1988). To prove waiver of a contractual right requires evidence of "a clear manifestation of intent ... to relinquish the protections of [the] contractual [provision]." *Id.* A party need not prove detrimental reliance to establish waiver. *Nassau Trust Co. v. Montrose Concrete Products Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 668, 436 N.E.2d 1265 (1982). Waiver may be established as a matter of law when "undisputed acts or language of the party against whom the waiver is asserted [are] so inconsistent with its purpose to stand upon its rights as to leave no opportunity for a reasonable inference to the contrary." *Hevenor v. Union Ry. Co.*

*of New York City,* 204 A.D. 535, 198 N.Y.S. 409, 410 (1st Dep't 1923).

New York courts have recognized that "[g]enerally, the acceptance of [a party's performance] and payment therefore precludes a later action by a party to the contract for defects in performance." *Village of Endicott v. Parlor City Contracting Co., Inc.,* 51 A.D.2d 370, 372, 381 N.Y.S.2d 548, 549 (3d Dep't 1976); *see also Bowen v. Horgan,* 259 N.Y. 267, 269, 181 N.E. 567 (1932) ("Continued insistence by one party to a contract upon performance by the other party, even after default, may constitute a waiver of such default."). One court, however, has noted that

a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future.

*Seven–Up Bottling Co. (Bangkok) v. Pepsico, Inc.,* 686 F.Supp. 1015, 1023 (S.D.N.Y. 1988) (citing *S.D. Hicks and Son Co. v. J.T. Baker Chemical Co.,* 307 F.2d 750 (2d Cir. 1962) and *Canda v. Wick,* 100 N.Y. 127, 2 N.E. 381 (1885)).

■ The Court does not believe that HCS has carried its heavy burden to establish waiver as a matter of law. Nothing in the record clearly indicates that SIH at any time intended to waive the defects in HCS's performance under the contract. Although SIH's continuing under the contract for eighteen months after it had informed HCS during the May 1987 meeting that it believed HCS had not provided service in accordance with the terms of the Agreement could be viewed as conduct inconsistent with an intent to preserve claims for breach of the agreement, other reasonable inferences could be drawn from the facts in the record.

At issue here is SIH's intentions, not the reasonableness of its actions. SIH has directed the Court's attention to evidence that, if believed by a jury, could provide a basis for a finding that SIH did not intend

---

**3.** The Agreement expressly provided that New York law would govern the parties' rights. Both parties have pursued this motion on the assumption that New York law applies. Therefore, the Court will apply the law of New York as to all issues raised by this motion.

to waive its damage claims, and that its continued acceptance of HCS's performance under the Agreement did not constitute a waiver.

After SIH informed HCS at the May meeting that it intended to replace the HCS system, HCS sent a letter demanding full payment under the contract. The letter further stated that HCS would "consider" a prepayment plan *"in the event you wish HCS to release the data* to your new consultant."· (Exhibit B, Fahey Affidavit) (emphasis added). Under the arrangement between the parties, HCS had sole control of SIH's data. HCS could, therefore, if it chose, withhold SIH's data until full payment was made. A second letter sent in July from HCS to SIH reduced the demand for payment slightly but offered to provide assistance in the transition to a new system only if SIH paid HCS a flat fee of $50,000 for which 50 hours of service would be provided. Moreover, SIH representatives were aware of anecdotal evidence that HCS had given other clients a difficult time, and had in one instance trespassed on client property to retrieve data when the client attempted to terminate a contract.[4]

A jury could reasonably conclude from these facts that SIH never intended to waive its right to seek breach of contract damages, but merely continued performing under the contract until it no longer feared having its data withheld from it by HCS. Thus, although a jury could conclude that SIH had waived its right to demand performance from HCS in accordance with the Agreement by accepting and paying for substandard services, it could also rationally conclude that SIH never intended to do so. In light of all the facts in the record, SIH's conduct was not "so inconsistent with its purpose to stand upon its rights as to leave no opportunity for a reasonable inference to the contrary", *Hevenor,* 198

N.Y.S. at 410, thereby establishing waiver as a matter of law. There being a genuine dispute as to SIH's intent to waive its right to seek contract damages for HCS's failure to perform, the motion for summary judgment must be denied.

### C. *Equitable Estoppel*

■ The general principle of estoppel is no person may take advantage of his or her own wrong. Under New York law,

[t]he elements of equitable estoppel fall into two categories: those that relate to the party sought to be estopped, and those that relate to the party asserting the estoppel. The essential elements relating to the party to be estopped are: (1) conduct which amounts to a false representation or concealment of material facts or which gives the impression that the facts are otherwise than asserted, (2) intention or expectation that such conduct would be relied upon by the other party, and (3) actual or constructive knowledge of the real facts. The elements relating to the party asserting the estoppel are: (1) lack of knowledge and the means of acquiring the knowledge of the real facts, (2) reliance on the conduct of the party to be estopped, and (3) action based thereon resulting in a prejudicial change of position. *State Bank of Albany v. Fioravanti,* 70 App.Div.2d 1011, 1012–13, 418 N.Y.S.2d 202, 203–04 (3d Dep't 1979) [,*aff'd,* 51 N.Y.2d 638, 435 N.Y.S.2d 947, 417 N.E.2d 60 (1980)].

*United States v. Bedford Associates,* 491 F.Supp. 851, 866–67 (S.D.N.Y.1980), *aff'd in pertinent part,* 657 F.2d 1300 (2d Cir. 1981), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). Under New York law, "[a]n estoppel may arise from an apparent waiver even though the element of intent, which is essential to constitute a

---

**4.**· If such evidence was offered to prove the state of mind of SIH and not to prove the truth of its contents, it would not constitute hearsay. *See Link v. Mercedes–Benz of North America, Inc.,* 788 F.2d 918, 926–27 (3d Cir.1986) ("the hearsay rule does not bar the admission of out-of-court declarations that are not offered for the truth of the matter asserted therein."); McCormick on Evidence § 249 (3rd Ed.1984) ("When it is

proved that D made a statement to X, with the purpose of showing the probable state of mind thereby induced in X, ... to show the information which X had as bearing on the reasonableness or good faith ... of the subsequent conduct of X, ... the evidence is not subject to attack as hearsay."); 6 Wigmore on Evidence § 1789 (1976); *Federal Deposit Insurance Corp. v. Marina,* 892 F.2d 1522, 1526–27 (11th Cir.1990).

real waiver, is absent, where the conduct of the party has misled the other party by inducing in him a belief, which is reasonable under the circumstances of the case, that there has been a waiver." *Baron v. Lombard,* 71 A.D.2d 823, 824, 419 N.Y.S.2d 388, 389 (4th Dep't 1979), *aff'd,* 50 N.Y.2d 896, 430 N.Y.S.2d 591, 408 N.E.2d 920 (1980).

HCS contends that SIH is equitably estopped from seeking damages for breach of the Agreement. Its theory is that SIH's conduct after the May 1987 meeting constituted an "apparent waiver" that induced HCS to believe HCS's performance under the Agreement was adequate, and that HCS relied on that conduct in continuing its performance for an additional eighteen months until the relationship was terminated by SIH. HCS claims that, had it known that SIH considered HCS's performance to be in breach of the Agreement, it would not have continued its performance unchanged under the Agreement, but would have: (1) insisted that the Agreement be renegotiated; (2) sought additional assistance in its performance; or (3) worked with the Hospital to convert to the new system. (Fahey Affidavit, ¶ 16).

■ The Court flatly rejects HCS's argument that SIH is estopped from seeking *any* breach of contract damages. SIH's conduct beginning eighteen months into the Agreement could not form the basis for any reliance by HCS before that time. As reliance is the basis for an estoppel, the Court will only consider whether SIH is estopped from seeking damages for the period after May 1987 meeting.

■ It is fairly clear that SIH declared its intention to replace the HCS system in its June 2, 1987 letter. SIH was put on notice by the June 11, 1987 letter, however, that HCS considered the Agreement to have been complied with, and that it expected full payment under the Agreement. Despite this, SIH did not afterwards protest that the management fees were excessive in light of the poor performance of the system, attempt to renegotiate those fees, or otherwise reserve its rights or refute the June 11 letter. Instead, SIH continued to pay in full the management fees required under the Agreement. HCS was thus led to believe that SIH had reconsidered its earlier position, and that HCS's services and the management fees were acceptable to SIH. On that basis, HCS was induced by SIH to render performance that SIH believed at that time was inadequate and as to which SIH would seek to recover damages. This constituted an "apparent waiver" relied on by HCS to its detriment. On these undisputed facts, the Court is satisfied that SIH is estopped as a matter of law from now contending that the management services provided after SIH received the Fahey letter dated June 11, 1987 were in breach of the Agreement and of lesser value than the management fees paid for those services.

SIH took a calculated risk when, with full knowledge of the level of performance it could expect from HCS, it induced HCS to provide further services that it intended to later assert were defective. Although SIH now explains its decision as necessary to prevent the possibility that HCS would cut off SIH's access to its own data, it took the risk that it would later be precluded from seeking damages for those further services. Perhaps SIH believed that, after it cut off its connection to HCS, HCS would not sue for breach of contract in light of its own allegedly abysmal performance. SIH may also have believed that if it "ate" the cost of the additional eighteen months of management fees, HCS may have been willing to walk away from the relationship. In hindsight, a wiser decision might have been to reaffirm to HCS its plans to replace the system, and to continue to negotiate a termination of its relationship with HCS. Had HCS then attempted to hold SIH's data hostage, as SIH claims it feared, SIH could have sought injunctive relief on an emergent basis from a local court. The course taken by SIH, however, of inducing HCS to provide substantial further services by paying in full for those services without protest after being notified that full payment was expected and that HCS believed its performance was in compliance with the terms of the Agreement, bars SIH from

now attempting to recover any part of the fees paid for those services. *Cf. Deutsch v. Health Ins. Plan of Greater New York*, 573 F.Supp. 1433, 1441–42 (S.D.N.Y.1983) (acquiescence in other party's performance and failure to renegotiate fees under contract after learning that patient referrals made pursuant to contract were less than expected estops party from claiming breach of contract damages for performance after learning of true facts).

### D. *Ratification*

■ HCS also seeks summary judgment in its favor as to defendant's contract counterclaim on the ground of ratification. HCS claims that SIH ratified the Agreement, and thus may not seek breach damages, by its acceptance of the benefits of the Agreement for eighteen months without protest after it believed that HCS had breached the Agreement. HCS's argument is misplaced.

■ The concept of contract ratification has no application to the facts of this case. Ratification applies only when an otherwise valid contract is *voidable* "because of legal incapacity, lack of authority, or the party's unwillingness or absence of intent to enter into it on the terms stated." *Leasing Service Corp. v. Vita Italian Restaurant, Inc.*, 171 A.D.2d 926, 927, 566 N.Y.S.2d 796, 797 (3rd Dep't 1991). The doctrine exists to hold a party to the terms of an otherwise voidable agreement when that party has affirmed the validity of the contract by accepting its terms and performing under it after learning of the true facts or following the end of the disability rendering it voidable. *Id.* Ratification is therefore a defense to a claim that a contract is invalid, not to a claim for breach of contract. None of the cases cited by HCS holds to the contrary. Because there is no allegation by SIH of fraudulent inducement, duress, or other infirmity that renders the Agreement voidable, the defense of ratification has no relevance to this action.

### E. *UCC § 2-607*

■ HCS contends that SIH waived its right to seek damages for breach of contract by its failure to "notify" HCS of a breach "within a reasonable time", as required by the New York Uniform Commercial Code ("NYUCC") § 2–607(3)(a). According to Official Comment 4 to this section, "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." Under this standard, SIH clearly complied with the notice requirement of § 2–607. HCS was aware from the outset that SIH believed the system did not perform to contract specifications. It is undisputed that HCS was informed on a continuing basis of the problems with the system, and that weekly meetings were attended by HCS in which these problems were discussed.

The purpose of the notice requirement is to avoid surprise and to provide an opportunity for the seller to cure defects. Both of these purposes were satisfied by the notice provided to HCS. For HCS to now contend that it lacked notice of these defects is simply incredible. The facts present here are nothing like the "intermittent undated complaints to unidentified ... personnel over several years" that was found inadequate as a matter of law in *Kohl & Madden Printing Ink Corp. v. Goshen Litho, Inc.*, 94 A.D.2d 660, 661, 462 N.Y.S.2d 462, 464 (1st Dep't 1983), relied on by HCS. HCS's further argument that SIH's conduct following the May 1987 meeting vitiates the notice provided earlier is adequately addressed above in the discussion of equitable estoppel, and need not be readdressed.

### F. *Tort Counterclaims*

SIH has alleged several counterclaims that sound in tort: (1) negligent design and repair; (2) negligent misrepresentation; and (3) professional malpractice. HCS has moved for summary judgment dismissing these claims as a matter of law. SIH has conceded that the negligent design and negligent misrepresentation claims are not viable under New York law. (Opposition

Brief at 43). Those claims will therefore be dismissed with prejudice. SIH contends, however, that the claim of professional, or "computer", malpractice should be preserved. The Court disagrees.

■■■ In support of its "computer malpractice" claim, SIH cites only one decision, by an intermediate state appellate court in Indiana, *Data Processing Services, Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314 (Ind.App.1986).[5] Based on *Data Processing Services*, SIH asks the Court to predict that New York would recognize a computer malpractice cause of action. SIH's only argument is that computer consultants are "professionals" in the same sense as doctors, lawyers, accountants, engineers, architects, and others, who are held to a higher standard of care under the law. This argument is not supported by New York law.

The New York Court of Appeals has stated that

> A profession is not a business. It is distinguished by the requirements of extensive formal training and learning, admission to practice by a qualifying licensure, a code of ethics imposing standards qualitatively and extensively beyond those that prevail or are tolerated in the marketplace, a system for discipline of its members for violation of the code of ethics, a duty to subordinate financial reward to social responsibility, and, notably, an obligation on its members, even in non-professional matters, to conduct themselves as members of a learned, disciplined, and honorable occupation.

*In re Estate of Freeman (Lincoln Rochester Trust Co. v. Freeman)*, 34 N.Y.2d 1, 7, 355 N.Y.S.2d 336, 339, 311 N.E.2d 480 (1974). Professionals may be sued for malpractice because the higher standards of care imposed on them by their profession and by state licensing requirements engenders trust in them by clients that is not the norm of the marketplace. When no such higher code of ethics binds a person, such

trust is unwarranted. Hence, no duties independent of those created by contract or under ordinary tort principles are imposed on them. SIH has not established, nor could it, that computer consultants meet the requirements necessary under New York law to give them the status of professionals. Accordingly, this Court does not believe that the cause of action for professional negligence would be recognized by New York courts as against computer consultants. Therefore, summary judgment will be granted against SIH on its claim for malpractice, and that claim will be dismissed.

### G. *Damages*

HCS has moved on several grounds for summary judgment to limit the damage remedies SIH seeks to recover on its contract counterclaims. SIH seeks to recover certain costs associated with its acquisition and implementation of the Baxter system that was installed to replace the HCS system. HCS contends that under the New York common law of contracts, the costs associated with obtaining the Baxter system are not recoverable because they were neither contemplated nor foreseeable by either party at the time that the contract was entered into. Further, HCS claims that as a matter of law SIH may not recover the costs of the Baxter system under the NYUCC, either as "cover" or as consequential damages.

■■■ SIH has asserted that the NYUCC governs the contract remedies that are available to it. HCS has not disputed this assertion. The Court agrees that the damage remedies in the NYUCC controls, *see Communications Groups, Inc. v. Warner Communications, Inc.*, 138 Misc.2d 80, 527 N.Y.S.2d 341 (Civ.Ct.1988) and cases cited therein, and it therefore need not address HCS's arguments under the common law.

SIH has conceded in its brief that it had "accepted" the HCS system. (Opposition Brief at 22). Its principal theory of entitle-

---

**5.** SIH also cites to *Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293 (8th Cir.1989), but that case is inapposite because it involved a professional malpractice claim against Ernst & Whin-

ney, an accounting firm. Accountants are universally recognized as "professionals" who are held to a higher standard of care.

ment to costs of the replacement Baxter system is that it "revoked acceptance" pursuant to NYUCC § 2–608 [6] at the May 1987 meeting and through the followup letter of June 2, 1987 from Messier to Fahey, and is therefore entitled to "cover" damages under NYUCC §§ 2–711 and 2–712.[7]

HCS has not in its counterclaims alleged that it revoked acceptance of the HCS system and was forced to seek "cover", but has alleged only breaches of warranties, technically, "cover" is not available to SIH. *See* NYUCC § 2–711, Comment 1 (McKinney 1964) ("the remedies listed here are those available to a buyer who ... has justifiably revoked his acceptance"); J. White and R. Summers, Uniform Commercial Code § 10–1 at 375 (2d Ed.1980) (breach of warranty damages are "mutually exclusive" from remedies available when goods have been rejected or acceptance has been revoked). Nevertheless, the Court will address SIH's "cover" theory of damages because: (1) SIH has alleged revocation of acceptance as an affirmative defense to the breach of contract claims alleged in HCS's complaint, thus giving notice of this theory to HCS; (2) both parties have proceeded through discovery on the basis that the revocation/cover theory is in issue; (3) both parties have fully briefed the issue on this motion; and (4) SIH could easily amend its counterclaims without prejudice to HCS to allege this theory of damage.

### 1. Did SIH Revoke Acceptance?

HCS argues in support of its motion for summary judgment on the issue of

SIH's entitlement to "cover" damages that SIH never properly revoked acceptance. It contends that the record "establishes that the events of May 1987 could not have constituted a revocation." (Reply Brief at 12). The Court finds that a genuine factual dispute exists as to whether SIH revoked acceptance.

In support of its contention as to the absence of revocation, HCS directs the Court's attention to various items of record evidence. This evidence consists of internal letters between Titterton and SIH representatives from the summer of 1987 to as late as July 1988 in which plans to "terminate" the Agreement are discussed. Further relied on is deposition testimony of SIH's Ferlisi, who acknowledged that he did not recall SIH sending "notice of termination" prior to March 9, 1989, when SIH informed HCS by letter that it would disconnect itself from the HCS system and terminate the Agreement effective February 1, 1989.

Ignored by HCS is equally compelling evidence that SIH revoked acceptance when it informed HCS in May and June of 1987 that it no longer wanted the HCS system and that it had decided to replace that system. In the June 2, 1987 letter from Messier to Fahey, SIH informed HCS that it had "decided to wipe the slate clean and try another vendorized financial system." (Ex. A, Fahey Affidavit). The letter also clearly stated SIH's dissatisfaction with the HCS system and characterized SIH's losses as a result of HCS's failure to perform as "major and significant."

---

**6.** NYUCC 2–608 provides in relevant part that
(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
 (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured....
(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and any substantial change in conditions of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

**7.** NYUCC § 2–711 states that a buyer who has revoked acceptance may "cover" and obtain

damages in accord with NYUCC § 2–712. NYUCC § 2–712 provides that

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without reasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2–715), but less expenses saved in consequence of the seller's breach.

Also of record is deposition testimony by Messier in which he indicates that SIH notified HCS of its termination of the Agreement in 1987. In a discussion of the May 1987 luncheon meeting, the following exchange occurred:

Q. And you recall that that [the May 1987 luncheon meeting] was the first notice that the hospital gave to HCS that it was terminating its contractual relationship?

A. Correct.

Q. What did you say to Mr. Fahey to put him on notice of the fact that you were terminating the hospital's relationship with HCS?

A. That the reason for termination was really non-performance....

(Messier Dep. at 76–77, Ex. E, Snover Affidavit). Further evidence that a revocation occurred at the meeting is contained in the affidavit of Gerald Ferlisi. (Ferlisi Affidavit ¶ 7 ("During that [May 1987] luncheon meeting, SIH ... clearly and unequivocally advised HCS of its decision to terminate the contract and acquire a new system")). From this evidence, a jury could rationally find that SIH had revoked acceptance of the HCS system at the May 1987 meeting and through the June 2, 1987 letter confirming the events of that meeting. Because a genuine factual dispute exists as to the issue of revocation of acceptance, HCS's motion for summary judgment on this issue must be denied.

2. Did SIH Invalidate Acceptance Through Its Subsequent Course of Conduct?

 Alternatively, HCS argues that even if acceptance of the HCS system was revoked in May or June 1987, SIH's subsequent course of conduct constituted an acceptance that invalidated the revocation. HCS contends that SIH's continued use of the HCS system for an additional eighteen months after allegedly revoking acceptance was unreasonable and inconsistent with its intent to revoke acceptance, and thus vitiated any revocation. In support of this argument, HCS has directed the Court to *Computerized Radiological Services v. Syntex Corp.*, 786 F.2d 72, 75 (2d Cir.1986)

and *Sobiech v. Int'l Staple & Machinery Co.*, 867 F.2d 778, 780–81 (2d Cir.1989), two cases in which the court found as a matter of law that prolonged use of goods after revocation of acceptance was unreasonable and constituted re-acceptance.

*Radiological Services* can readily be distinguished from this case. There, the court found that a valid revocation of acceptance of a CAT scanner was invalidated by the buyer's continued use of the machine for 22 month after revocation. 786 F.2d at 75–76. In so holding, the Second Circuit relied primarily on the buyer's failure to search for a replacement machine for a significant period of time after revocation. *Id.* Although the buyer had revoked acceptance in June 1978, "[t]he negotiations that led to the purchase of the [replacement] device apparently did not begin until October, 1979, delivery occurring in April, 1980." *Id.* at 75. Unlike the buyer in *Radiological Services*, however, SIH began almost immediately to search for a replacement system, and, considering the complexity of negotiating for, purchasing and implementing a customized computer software system, its completion of these tasks within eighteen months could certainly be found by a jury to have been reasonable.

*Sobiech*, also cited by HCS, is also clearly distinguishable. Much unlike this case, there, the buyer contended that his "bringing of the ... lawsuit was a valid revocation of acceptance." 867 F.2d at 781. The court disagreed, noting that Sobiech's continuous use of the machinery in question for more than three years without obtaining or seeking a replacement was unreasonable as a matter of law. *Id.*

HCS further argues that the concealment by SIH of its efforts to replace the HCS system and its continued payments under the contract constituted bad faith on SIH's part. The Court believes that a different conclusion could be reached by a jury. As discussed above under Subsection B, a jury could rationally conclude that SIH had reason to believe that its data would be withheld by HCS had SIH openly changed to a new system. From this conclusion, a jury could further conclude that SIH acted in good faith. Thus, HCS's argument that,

as a matter of law, the circumstances surrounding SIH's continued use of the system after revocation constituted an acceptance invalidating the revocation, is not persuasive.

 Although the manner in which SIH went about replacing the HCS system could be found by a jury to have been in bad faith or unreasonable, it is open to dispute, making summary judgment inappropriate. HCS's further argument that SIH's failure to seek HCS's assistance in converting to a new system constituted a failure to mitigate damages may well succeed at trial in reducing any recovery SIH may receive, but it does not deprive SIH of its right to seek damages. Moreover, the Court need not pass on whether particular items of damage sought by SIH in connection with its "cover" are recoverable. Unreasonable expenses (such as perhaps a jury might find those costs associated with putting into place the "emergency plan"), or extra costs associated with purchasing a system of greater value and capability, may be found by a jury to be non-compensable. These decisions, however, require resolution of many fact issues, and are for the jury to decide.

As the Court discussed above under Subsection C, SIH is estopped from seeking recovery of any of the management fees paid during the 18 months following the May 1987 meeting. The extent to which SIH benefitted from its use of the HCS system for the first 18 months of the Agreement is a factor that the jury would have to consider in determining damages due to SIH. The fair market rental value of the system, which may be less than the management fee due to the defective performance of the system, could well be deducted by the jury from any damage award based on the costs of "cover." *See* White & Summers, *supra*, § 8–3 at 317; *see also General Motors Acceptance Corporation v. Jankowitz*, 216 N.J.Super. 313, 523 A.2d 695 (App.Div.1987).

3. Can Replacement Costs Be Recovered Even in Absence Of Valid Revocation?

 Last, HCS contends that SIH may not recover its replacement costs if it is found not to have properly revoked its acceptance of the HCS system. HCS correctly notes that the "cover" provisions, NYUCC §§ 2–711, 2–712, apply only when goods have been rejected or acceptance has been revoked. NYUCC § 2–711, Comment 1 (McKinney 1964) ("the remedies listed here are those available to a buyer who has not accepted goods or who has justifiably revoked his acceptance"). HCS further correctly notes that when goods have not been rejected or their acceptance has not been revoked, damage remedies are governed by NYUCC § 2–714. Although SIH states in its Opposition Brief that "cover" is available even if goods have been accepted, its argument makes clear that it relies on NYUCC § 2–714, and not NYUCC § 2–711, and refers to replacement costs, not "cover" damages.

Under § 2–714(1), a buyer may recover damages due to non-conformities in accepted goods "in any manner which is reasonable." The measure of such damages is defined in § 2–714(2) as "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Further, § 2–714(3) provides that "[i]n a proper case incidental and consequential damages under [§ 2–715] may also be recovered."

*Gem Jewelers, Inc. v. Dykman*, 160 A.D.2d 1069, 553 N.Y.S.2d 890 (3rd Dep't 1990) is instructive. In that case, plaintiff had purchased cabinets from defendant made to order for its store. The contract price was $36,000. In the fall of 1984 the cabinets were installed. After paying over $32,000 on the contract, plaintiff complained to defendant in May 1986 that the cabinets were of inferior quality to what was required by the contract, and that their appearance had become "horrible." At trial, plaintiff introduced testimony that the cost to replace the cabinets to conform to the contract would have been $44,000, and that the cabinets made by defendant had

only salvage value. On that basis, the jury awarded plaintiff $40,000 in damages.

The Appellate Division affirmed the verdict and held that when unique custom-made goods are involved, "special circumstances" may exist under § 2–714(2) justifying departure from the normal rule of that section. *Id.* at 1071–72, 553 N.Y.S.2d at 892–93. It further held that replacement costs are appropriate in the case of custom goods because such costs can be "a proper method of determining the value of goods as warranted under U.C.C. 2–714(2)." *Id.* at 1072, 553 N.Y.S.2d at 893.

 A jury could easily find that the computer software system created by HCS for SIH was a unique, customized good, as it was specifically tailored to the individual specifications of the hospital. A jury could also find that the Baxter system was unique and made to order. HCS's argument that *Gem Jewelers* is distinguishable because of the uniqueness of the goods involved is thus without merit. Hardwood cabinets built to size are not inherently more unique than an extensive computer software package programmed to meet SIH's own specifications. Hence, SIH may under *Gem Jewelers* argue to the jury that in the event the jury finds that acceptance was not revoked, it could nonetheless consider whether replacement costs (i.e., the costs associated with the Baxter system) are a "reasonable" measure of the warranted value of the HCS system even if they exceed the contract price. Likewise, HCS will be free to argue to the jury that the reasonable value of the system as warranted is the contract price. White & Summers, *supra*, § 10–3 at 382. In any event, the jury would have to determine the value of the goods provided by HCS, and could award the difference between the warranted value and the actual value, plus any consequential or proximate damages if "special circumstances" made this a "proper case." NYUCC § 2–714.

HCS's reliance on the unpublished decision in *Long Island Lighting Co. (LILCO) v. IMO Industries, Inc.,* 1990 Westlaw 64588 (S.D.N.Y.) is misplaced. In that case, LILCO attempted to recover various forms of damages totalling over $245 million due to a breach of warranty with respect to a $2.1 million purchase of diesel generators. The court rejected LILCO's argument that it could recover replacement costs for two alternative Colt diesel generators because LILCO had repaired the defective IMO generators and continued using them, while never making use of the replacements. The court held that an aggrieved party could not replace *and* repair defective goods, and be compensated for both.

By contrast, SIH diligently, albeit secretly, replaced the HCS system with a new system, and relinquished the old system to HCS. Because equitable considerations dictate that, in the event HCS is liable for breach damages, it would be entitled to offset the fair market value of the services provided to SIH (which HCS contends constitutes "repair costs"),[8] *see Community Television Services, Inc. v. Dresser Industries, Inc.,* 435 F.Supp. 214, 217 (D.S.D. 1977), *aff'd,* 586 F.2d 637 (8th Cir.1978), *cert. denied,* 441 U.S. 932, 99 S.Ct. 2052, 60 L.Ed.2d 660 (1979) and White & Summers, *supra,* § 10–2 at 378–79, it cannot seriously contend that SIH will receive a double recovery for both "replacement" and "repair" of the system.

### CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment will be granted as to Counts Four, Five and Six of defendant's Counterclaims, and those Counts will be dismissed with prejudice. Plaintiff's motion for summary judgment will be denied as to Counts One, Two and Three of defendant's Counterclaims in all respects except that defendant will be barred from seeking the recovery of any

---

**8.** For the first 18 months of services, this value could be found to be considerably lower than the contract amount if SIH proves that the system was defective. For the second 18 months of services, as discussed in Section C above, SIH is estopped from asserting that the fair market value of the services is less than the contract amount for management fees paid during that period.

management fee paid to plaintiff after defendant received plaintiff's letter dated June 11, 1987.