G. Freeland LOFTIN, Plaintiff–Appellee,

v.

Judy LANGSDON, Director of Development for Maury County, and the Maury County Planning Commission, a body composed of Alice Algood, Cyril Evers, Margaret Dean Adkin, Billy Benefield, Ed Martin, J.B. Erwin, Eugene Bond, and Campbell Ridley, Jr., Defendants–Appellants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 28, 1991.

Application for Permission to Appeal Denied by Supreme Court June 24, 1991.

John W. Steenbergen, III, Bob Grefseng, Columbia, Paul Bates, Lawrenceburg and Russ Parks, Columbia, for plaintiff-appellee.

Will Dale, Jr., Columbia, for defendants-appellants.

## OPINION

LEWIS, Judge.

The Chancery Court for Maury County issued a declaratory judgment in favor of plaintiff-appellant, G. Freeland Loftin, that Loftin's proposed division of property for sale at an auction was not a subdivision within the meaning of the term subdivision as set forth in Tenn.Code Ann. § 13–3–401(4)(B). The trial court also issued a restraining order against defendants-appellants Judy Langsdon, Director of Development for Maury County, et al., (Langsdon) prohibiting the Maury County Regional Planning Commission from in any way interfering or stopping the proposed sale of property by Loftin. Langsdon appeals this judgment.

The pertinent facts are as follows:

Loftin purchased a large tract of land in the Rock Springs Community of Maury County in 1988. A farm house sat on the back of the property, and an easement for a driveway or lane ran from the public road to the highway. Although the deed showed the easement for this driveway to be 60 feet wide, only a narrow lane was passable at the time Loftin purchased the property.

In preparation of his plan to divide and resell a portion of the property, Loftin made major improvements to the land. He cleared the brush from much of the easement, and he graded and re-cherted the lane. To facilitate drainage, he dug ditches along both sides of the lane. He also installed a six inch water pipe along the length of the easement and made arrangements with representatives of the Duck River Electric Membership Corporation to have two poles and a power line installed on the property adjacent to the easement.[1] Loftin made all of these improvements at great expense to himself in anticipation of realizing a higher profit when the property was sold.[2]

Loftin divided this improved portion of his property into 18 separate tracts.[3] He named the lane to the farm house Beasley Lane. Thirteen of the tracts ranged in size from 5.16 to 7.63 acres and fronted on Beasley Lane. Loftin planned to sell the tracts at auction on 9 June 1990.

Pursuant to this plan, he advertised the upcoming auction in the local newspaper, *The Daily Herald.* The ad displayed a map of the available tracts complete with roads and described the property as follows:

> These tracts lay level to gentle rolling with plenty of good shade trees and are suitable for any style home. All tracts have good building sites, city water available, good building restrictions. These tracts are adjoining 20 tracts that were sold in December 1989 that have several very nice homes already built or under construction.

Judy Langsdon, Director of Community Development for Maury County, became aware of Loftin's plans by reading the ad in the Sunday paper. Her attention was captured by the designation on the map of a road called Beasley Lane. Since she knew there was no road in that area by that name, she assumed that Loftin had constructed a new road. This action, she believed, brought Loftin's project under the

---

**1.** The poles and the power line had not been installed by the date of trial.

**2.** The water line alone cost Loftin between $11,000.00 and $12,000.00.

**3.** Five of the tracts fronted on Rock Springs Road and Sowell Mill Pike, both of which are county roads. These five tracts ranged in size from 2.17 to 7.24 acres. The tracts fronting on the county roads are not the subject of this action.

Planning Commission's subdivision regulations.

After confirmation from the Maury County Road Superintendent that Beasley Lane was not a public right-of-way, Langsdon contacted Loftin and advised him that he could not proceed with his auction without prior approval from the Planning Commission. Langsdon warned Loftin that should he try to proceed with the auction without the Commission's approval, she would obtain a restraining order to stop him.

Loftin commenced this action on 1 June 1990. He asked the court for a declaratory judgment that his division and sale of the property did not constitute a subdivision under Tenn.Code Ann. § 13–3–401(4)(B) and thus did not come under regulation by the Planning Commission and for a temporary restraining order to bar Langsdon from interfering or stopping the sale which had been scheduled for eight days later. He also asked for an expedited hearing prior to the proposed sale.

Langsdon counter-claimed that the proposed division was a subdivision pursuant to Tenn.Code Ann. § 13–3–401(4)(B). She asked the court for a declaratory judgment so stating, for an injunction prohibiting the sale of the thirteen lots fronting on Beasley Lane until they were approved by the Planning Commission, and for an injunction requiring Beasley Lane to be clearly described as a private easement.

This action was heard on 8 June 1990. Both parties agreed that Planning Commission approval was necessary if the proposed division of the property required new street construction or utility construction. Both parties also agreed that the likely use for the property after the sale was residential. The parties agreed on very little else.[4]

Langsdon's position was that substantial road improvements had been made to the "driveway/road" to make it useable to the thirteen lots which fronted on it. There-

fore, road improvements were required for subdivision.

Loftin, on the other hand, contended that Beasley Lane had been in existence for at least 35 years and that, while he had graded and re-cherted it, he had not changed or relocated its route. He insisted that the lane was a private easement to which he would grant right of use to all those who chose to purchase property fronting on it. He compared Beasely Lane to private roads within a farm which are necessary to the farm's operations. When asked on cross-examination why the improved portion of Beasley Lane had ditches on both sides while the unimproved portion had none, Loftin replied that he didn't "think any ditches were required back then (when the lane was initially built)."

Loftin admitted that he put the water line in to make water available if the buyers wanted to hook onto it. He also admitted to negotiating with Duck River for the laying of power lines, but he insisted that future buyers could just as easily tie into existing power lines at the north and south ends of the property. When asked on cross-examination whether more power poles would have to be put along or near Beasley Lane "or the people along those thirteen lots couldn't tap on and get electricity to the property," Loftin answered, "Yes, I would suppose so. Yes."

In closing arguments Loftin maintained that the new utility construction which had already been accomplished on the property was not required. He insisted that the new property owners could drill a well rather than tap onto the new water line if they so chose.

Langsdon argued at trial that in order to use the property to build houses, there would have to be a water main and an electric main available to the new buyers. These improvements to the land did not exist when Loftin purchased the land. Loftin had provided, or was in the process of providing, these improvements in order to make the land useable. Langsdon urged

---

4. A major dispute arose over the proper designation of Beasley Lane. Langsdon insisted that it was a road while Loftin consistently called it a driveway. The trial court compromised by calling it a lane.

the court to consider the probable use of the land in determining whether utility construction was required.

Finding that the wording of Tenn.Code Ann. § 13-3-401(4)(B) was "a little bit too imprecise" to grant Langsdon the relief she was seeking, the court issued a declaratory judgment in favor of Loftin that the statute was not applicable to Loftin's property and that the requirements of Tenn.Code Ann. § 13-3-411[5] had been fulfilled. The court dismissed the counter-complaint and issued a restraining order "prohibiting and restraining the Maury County Regional Planning Commission from in any way interfering or stopping sale of property by the Plaintiff."

Langsdon appeals and asks this Court to review the following issue: "Is the development of Plaintiff-Appellee Loftin a subdivision under Tennessee law and subject to local subdivision regulations?"

■ The Tennessee law referred to by Langsdon is Tenn.Code Ann. § 13-3-401(4)(B). This statute provides:

"Subdivision" means, in all counties except those in subdivision (4)(A),[6] the division of a tract or parcel of land into two (2) or more lots, sites, or other divisions requiring new street or utility construction, or any division of less than five (5) acres for the purpose, whether immediate or future, of sale or building development, and includes resubdivision and when appropriate to the context, relates to the process of resubdividing or to the land or area subdivided.

In order to determine whether Loftin's division of property was a "subdivision," it is necessary for this Court to construe the meaning of this statute. Both parties direct our attention to the phrase "requiring new street or utility construction." However, to give the proper meaning to this phrase we must look at the statute as a whole. "It is improper for the Court to lift one sentence, word or clause from a statute and construe it alone, without reference to the balance of the statute." *State ex rel. Rector v. Wilkes,* 222 Tenn. 384, 390, 436 S.W.2d 425, 427 (1968) (citing *Rose v. Blewett,* 202 Tenn. 153, 303 S.W.2d 709 (1957).

■ A statute's meaning is to be determined, not from special words in a single sentence or section, but from the act taken as a whole, and viewing the legislation in the light of its general purpose. *Cummings v. Sharp,* 173 Tenn. 637, 642, 122 S.W.2d 423, 424 (1938).

■ Tennessee Code Annotated § 13-3-401 is the definitional portion of an overall legislative scheme dealing with regional planning.[7] The general purpose of regional planning is found at Tenn.Code Ann. § 13-3-302:

The regional plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted, efficient and economic development of the region which will, in accordance with present and future needs and resources, best promote the health, safety, morals, order, convenience, prosperity and welfare of the inhabitants, as well as efficiency and economy in the process of development, including, among other things, such distribution of population and of the uses of the land for urbanization, trade, industry, habitation, recreation, agriculture, forestry and other uses as will tend to create conditions favorable to transportation, health, safety, civic activities and educational and cultural opportunities, reduce the wastes of financial and human resources which result from either excessive congestion or excessive scattering of population, and tend toward an efficient and economic utiliza-

5. Tenn.Code Ann. § 13-3-411 states, in pertinent part:

[N]o building permit or certificate of compliance shall be issued for or no building or structure shall be erected on any lot within the area of jurisdiction of the regional planning commission ... unless such lot fronts upon a permanent easement with access to an existing public highway, street or thoroughfare....

6. Maury County is not one of the counties provided for in section (4)(A).

7. Title 13 of Tenn.Code Ann. is devoted to public planning and housing. Chapter 3 of Title 13 contains all of the regional planning statutes.

tion, conservation and production of the supply of food, water, minerals, drainage, sanitary and other facilities and resources.

Thus, statutes applicable to regional planning were enacted to "promote the health, safety, morals, order, convenience, prosperity and welfare of the inhabitants ...," *i.e.*, for the public good.

Statutes which introduce regulations conducive to the public good are remedial statutes. *Big Fork Mining Co. v. Tennessee Water Quality Control Bd.*, 620 S.W.2d 515 (Tenn.App.1981); *See*, 82 C.J.S. *Statutes* § 388 (1975). Remedial statutes are to be construed liberally in furtherance of the statute's purpose. *Dailey v. State*, 225 Tenn. 472, 470 S.W.2d 608 (1971).

 Loftin would have us focus almost exclusively on the word "requiring." Even though he installed a water line, he argues that this action was not required since any purchaser could choose to dig a well instead of tapping onto this line. He further argues that his grading, resurfacing, and digging ditches along Beasley Lane was not required construction but was merely the clearing of an existing lane. While he admits that the purchaser will still have to add two power poles in order to supply power to these tracts, he insists that this would be "no greater construction of utilities" than would be required on the undisputed tracts which are also for sale. Furthermore, he testified that the reason no ditches were dug along the unimproved portion of the lane was because he did not "think any ditches were *required* back then (when that portion was built)." (Emphasis added.)

The essence of Loftin's argument appears to be: If the seller makes the improvements necessary for the division and sale of his property voluntarily before anyone tells him that those improvements are required, then the improvements are not required. Furthermore, since the improvements were not required, there is no reason for the seller to go before the Planning Commission to inquire as to whether or not the improvements are required. This argument leads ultimately to a "catch 22" which

would render the statute meaningless when applied to any division of property over five acres in size and would defeat the intent of the legislation. Such a result is absurd.

In construing a statute it is the duty of the court to give every word and phrase meaning. *United Canners, Inc. v. King*, 696 S.W.2d 525 (Tenn.1985). We must construe the statute so that no part is inoperative, superfluous, void or insignificant. *Tidwell v. Collins*, 522 S.W.2d 674 (Tenn. 1975). "Statutes are not to be construed so strictly as to defeat the obvious intention of the legislature.... Questions involving statutory construction 'must be answered in light of reason, having in mind the object of the statute, and the mischief it aims at.'" *State v. Netto*, 486 S.W.2d 725, 728 (Tenn.1972) (citation omitted). Therefore, indefinite and unclear words in the statute must be given such interpretation as will express the legislature's intention and purpose. *Hood v. State*, 187 Tenn. 501, 216 S.W.2d 14 (1948).

 Loftin acknowledges that the purpose of his driveway/lane is to provide access to the subdivided lots from the public roadway. The purpose of Planning Commission regulations dealing with road construction is to insure that the roads are built in a manner such as will protect the health, safety, and welfare of the citizens. According to these regulations, the developer must have the road construction plans designed and sealed by a licensed civil engineer. These plans must show drainage tiles, ditches, grades, elevations, and the base and finish in detail. These plans must be approved before the developer can implement them. There is no evidence in the record that Loftin has taken any of the actions necessary to insure that his driveway/lane is safe, and under Loftin's proposed construction of the statute there is no governmental body with oversight to guarantee to the public that his driveway/lane is safe. Yet it is obvious that the intent of the legislature was that roadways traveled by the general public be safe.

Loftin admits that further utility construction is required if these buyers are to receive electricity on their lots from a pub-

lic utility (only a minute percentage of our society produces its own alternative source of energy). Again, under his proposed construction of this statute, there is no one the public can look to for assurance that the poles have been set and the wires have been strung in a safe manner. The public would just have to take the large developer's word for it.

If one were to follow Loftin's reasoning, small developers (those offering lots of under five acres for sale) would be subject to planning commission regulations if utility or road construction were required, but large developers, who installed these conveniences of modern living before offering their lots for sale, would not be under such constraints. Such a construction of this statute would be absurd.

It is presumed that the legislature in enacting a statute did not intend an absurdity, and such a result will be avoided by this Court if the terms of the statute admit of it by reasonable construction. *Epstein v. State*, 211 Tenn. 633, 366 S.W.2d 914 (1963).

Furthermore, in construing a statute, the intention of the legislature is to be gathered from words it has used and not from words it has chosen not to include. *Dwyer v. Progressive Bldg. & Loan Ass'n*, 20 Tenn.App. 16, 94 S.W.2d 725 (1935).

The phrase Loftin asks us to construe says: "other division requiring new street or utility construction...." Tenn.Code Ann. § 13–3–401(4)(B). The phrase does not say: "new street or utility construction required *by a planning commission*." To add such a phrase to the statute would effectively amend the statute.

This Court will not depart from the cardinal rule of construction that the interpretation of statutes does not extend to amendment of legislation. *Ladew v. Tennessee Copper Co.*, 179 F. 245, (C.C.Tenn.) *aff'd*, 218 U.S. 357, 31 S.Ct. 81, 54 L.Ed. 1069 (1910).

This statute, like all statutes, must be applied in its present form unless doing so would result in "manifest injustice." *Scarboro v. First Amer. Nat'l Bank of Nashville*, 619 F.2d 621, *cert. denied*, 449 U.S. 1014, 101 S.Ct. 572, 66 L.Ed.2d 472 (1980). There is no "manifest injustice" in applying this statute evenhandedly to large and small developers or in applying the statute in a manner that will further enhance the health, safety and welfare of the community.

We must take the words of this statute in their natural and ordinary sense without forcing a construction upon them which would limit their meaning. *State v. Thomas*, 635 S.W.2d 114 (Tenn.1982); *State v. Hinsley*, 627 S.W.2d 351 (Tenn.1982); *see, Nashville Gas & Heating Co. v. City of Nashville*, 177 Tenn. 590, 152 S.W.2d 229 (1941). Loftin's proposed construction would severely limit the meaning of this statute. Such a departure from the primary meaning of the words and statutory context in which they stand would alter the intent of this legislation. *Id.*

Loftin admits he made the road and utility improvements "to get the most money for (the land)." These improvements were "required" by the imperatives of the marketplace. These improvements were "required" within the ambit of Tenn.Code Ann. § 13–3–401(4)(B).

The judgment of the trial court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

TODD, P.J., and CANTRELL, J., concur.