# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**February 1, 2000**

**Cecil Crowson, Jr.
Appellate Court Clerk**

DUFFY TOOL & STAMPING, INC., )
)
    Plaintiff/Counter-Defendant/ )
    Appellant, )
) Sumner Chancery
VS. ) No. 95C-149
)
BOSCH AUTOMOTIVE MOTOR )
SYSTEMS CORPORATION, ) Appeal No.
formerly known as ) M1997-00144-COA-R3-CV
BG AUTOMOTIVE MOTORS, INC., )
)
    Defendant/Counter-Plaintiff/ )
    Appellee. )

APPEAL FROM THE SUMNER COUNTY CHANCERY COURT
AT GALLATIN, TENNESSEE

THE HONORABLE TOM E. GRAY, CHANCELLOR

For Plaintiff/Appellant:

John H. Rowland
Barbara A. Rose
Baker Donelson Bearman & Caldwell
Nashville, Tennessee

For Defendant/Appellee:

Joseph F. Welborn, III
Bass Berry & Sims
Nashville, Tennessee

## AFFIRMED IN PART; MODIFIED IN PART; AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# OPINION

This appeal involves a contract dispute between a manufacturer of automobile parts and one of its suppliers. After the manufacturer complained repeatedly about the quality of its parts, the supplier informed the manufacturer that it would no longer supply the parts even though two years remained on its contract. The manufacturer rejected a portion of the supplier's last shipment of parts and contracted with another supplier to take over the manufacturing of the parts. The original supplier then filed suit against the manufacturer in the Chancery Court for Sumner County for the balance due on its last shipment, and the manufacturer counterclaimed for breach of the supply contract. The trial court heard the case without a jury and determined that the supplier had breached the supply contract but was also entitled to a set-off based on its last delivery of parts. Accordingly, the trial court awarded the manufacturer a $133,542.66 judgment against the supplier. On this appeal, the supplier takes issue with the judgment on three grounds: that the parties modified their original contract; that the manufacturer waived its breach of contract claim; and that the trial court did not employ the proper measure of damages. We have determined that the evidence supports the trial court's conclusion that the supplier breached the contract but that the trial court incorrectly calculated the damages. Accordingly, we reduce the manufacturer's judgment against the supplier to $18,953.

## I.

Bosch Automotive Motor Systems Corporation ("Bosch") is the American subsidiary of a German corporation that is one of the world's largest independent manufacturers of automobile parts. It operates a plant in Hendersonville, Tennessee where it manufactures air conditioner blower motors, most of which it sells to Ford Motor Company for use in the Windstar van and the Taurus and Lincoln Continental automobiles.

In July 1993, Bosch entered into a three-year contract with Duffy Tool & Stamping, Inc. ("Duffy Tool"), an Indiana corporation, to supply mounting plates for the air conditioner motors being sold to Ford. The contract required the mounting plates to be manufactured to Bosch's specifications and also required Bosch to pay Duffy Tool $140,000 up front to enable Duffy Tool to design and install the special tooling needed to produce mounting plates consistent with Bosch's specifications.

Difficulties arose almost as soon as Duffy Tool began delivering mounting plates to Bosch. The parties had a running dispute over the scratching, bending, and rusting of the plates being delivered to Bosch in Tennessee. This dispute over the quality of the mounting plates proved to be an unresolvable sore spot between the parties. Duffy Tool began losing even more money under the contract following an increase in the cost of the steel used to make the mounting plates. In June 1994, with two years still remaining on an already

unprofitable contract, Duffy Tool gave Bosch six weeks notice of its decision to stop supplying mounting plates under the contract.

Duffy Tool's abrupt decision to walk away from the contract imperiled Bosch's ability to perform its contract with Ford because Bosch could not supply air conditioners without mounting plates. In turn, Bosch's inability to perform would affect Ford's production of its motor vehicles.[1] Accordingly, Bosch sought to meet with Duffy Tool to discuss how to continue receiving mounting plates until a new supplier could be found. At a meeting on July 8, 1994, Duffy Tool informed Bosch that it would continue to supply mounting plates for a limited time, but only if Bosch would agree to a ten percent price increase, as well as a $3,000 daily tooling set-up charge.

In an August 30, 1994 letter, Duffy Tool set out specifically its terms to "wind down the pre-existing agreement between our companies." The letter proposed (1) that Duffy Tool would continue to supply mounting plates through January 1995; (2) that part prices would be increased retroactively by ten percent from July 11, 1994; and (3) that Duffy Tool would be held harmless "on the tooling issue and all other claims related to the transition." In his September 2, 1994 response, Bosch's president replied that Bosch would not sue Duffy Tool "relative to the transactions involved on the tooling issue and in making a transition." He also alluded to other, otherwise unidentified, telephone conversations in which "certain agreements were reconfirmed between Duffy Tool and [Bosch] relative to our July 8 meeting."

In the latter half of 1994, Bosch contracted with Pax Machine Works, Inc., ("Pax Machine") of Celina, Ohio to take over the manufacturing of the mounting plates. This new contract required Bosch to pay a higher price for the mounting plates than it had originally agreed to pay Duffy Tool and to pay Pax Machine an additional $134,850 for the new tooling required to produce the mounting plates.

Duffy Tool delivered its last shipment of mounting plates to Bosch in December 1994 along with an invoice for $58,752.21. Bosch notified Duffy Tool in February 1995 that some of the mounting plates were defective. In response, Duffy Tool instructed Bosch to inspect all the plates and promised to make an adjustment if a significant number of the plates were damaged. Bosch sorted out the damaged mounting plates and scrapped them, but the parties could never agree on an adjustment. Accordingly, Bosch did not pay Duffy Tool's last invoice.

Duffy Tool sued Bosch in the Chancery Court for Sumner County to collect for the last shipment of mounting plates, and Bosch counterclaimed for breach of the supply contract. The trial court heard the case without a jury and found in favor of both parties.

---

[1]Bosch's vice president for engineering explained that "[t]he same way . . .Bosch could not have produced motors without a mounting plate, Ford could not have produced cars without a motor."

First, it determined that Duffy Tool had breached the supply contract and awarded Bosch a judgment for $182,522.93. The trial court also determined that Bosch owed Duffy Tool $48,980.27 for its last delivery of parts.[2] Accordingly, the trial court set off Duffy Tool's judgment against Bosch's judgment and awarded Bosch $133,542.66. Duffy Tool has appealed from this judgment.

## II.
### BOSCH'S WAIVER OF ITS BREACH OF CONTRACT CLAIM

We turn first to Duffy Tool's arguments that Bosch waived its breach of contract claim either by failing to give "proper notice" of the breach or by expressly disavowing its intention to sue Duffy Tool for breach of contract. We find both arguments to be legally and factually unsupported.

### A.
#### NOTICE OF THE BREACH

The first prong of Duffy Tool's waiver argument rests on Tenn. Code Ann. § 47-2-607(3)(a) (1996) which states that a buyer who has accepted a tender of goods and then discovers a breach must notify the seller within a reasonable time. This provision does not apply to circumstances such as those involved in this case.

Statutes must be construed in light of their apparent purpose. *See City of Lenoir City v. State ex rel. City of Loudon*, 571 S.W.2d 297, 299 (Tenn. 1978); *Medic Ambulance Serv. v. McAdams*, 216 Tenn. 304, 315, 392 S.W.2d 103, 108 (1965); *Loftin v. Langsdon*, 813 S.W.2d 475, 478 (Tenn. Ct. App. 1991). Tenn. Code Ann. § 47-2-607(3)(a), characterized as "a very rough rule for buyers," was enacted to counter "buyer abuse." 1 Thomas M. Quinn, *Quinn's Uniform Commercial Code Commentary and Law Digest* ¶ 2-607[A][3], at 2-486 (2d ed. 1991) ("Quinn"). Its aim is to flush out genuine breaches of contract by forcing buyers to promptly take issue with nonconforming goods. Thus, the provision defeats bad faith on the buyer's part[3] and protects sellers against noncurable and dubious, stale claims as to accepted goods. *See* 4 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2-607:5 (3d ed. rev. 1997). As envisioned by Tenn. Code Ann. § 47-2-607(3)(a), a seller of goods with timely notice that they are nonconforming may inspect the

---

[2]The trial court determined that Bosch was entitled to a $9,771.94 set-off against the unpaid balance of Duffy Tool's last invoice.

[3]When illustrating the sort of buyer's abuse that Section 2-607(3) is intended to remedy, commentators have noted that "[i]t is common, for example, for a buyer to be in arrears in . . . [paying] for merchandise. What is more common? When pressed, it is also common for the buyer to stall for time. Ploys of this type are legion, e.g., 'Your check is in the mail.' At some point, the buyer may well start complaining about the goods. This [complaining] shifts the focus to the goods and, [the buyer hopes], sets the stage for an 'adjustment' that scales down the amount due. It is not a pretty picture, and 2-607(3)(a) puts an end to such practices." Quinn, ¶ 2-607[A][3], at 2-486 to 2-487.

goods pursuant to Tenn. Code Ann. § 47-2-512 (1996) and then cure the defects or preserve evidence that no breach occurred.

The circumstances in this case do not resemble the factual circumstances at which Tenn. Code Ann. § 47-2-607(3)(a) was directed. We agree with Bosch that this case is more analogous to the circumstance arising when a seller refuses or fails to perform a contract by not delivering the contracted-for goods. In that circumstance, the breaching seller is legally presumed to know of both its contractual obligation to supply the goods and its failure to do so. Since the buyer has not accepted a tender of nonconforming goods, Tenn. Code Ann. § 47-2-607(3)(a)'s notice-of-breach requirement never comes into play. *See Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 152-53 n. 40 (6th Cir. 1983); *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 n. 39 (5th Cir. 1976). In this case the real dispute is over Duffy Tool's calculated refusal to tender contracted-for goods. Therefore, we find inapposite Duffy Tool's legal arguments about notice of breach after acceptance of tender.

The record also makes factually plain that Bosch considered Duffy Tool to be in breach, and it makes factually plain that Bosch objected to that breach. At the July 8, 1994 meeting, Bosch asked Duffy Tool to perform the contract, and Duffy Tool informed Bosch that it would not. To the extent that notice of breach is a fact question, *see T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 359 (5th Cir. 1980), the trial court specifically found that Bosch stated its objections to the breach, and the preponderance of the evidence supports that finding.

## B.
### EXPRESS WAIVER OF THE BREACH OF CONTRACT CLAIM

As an alternative, Duffy Tool argues that Bosch waived its breach of contract claim by acts and statements manifesting an intent and purpose not to assert that Duffy Tool breached its supply contract. This waiver argument is wholly unconvincing in light of the entire record.

Waiver is a voluntary relinquishment or renunciation of some right or a foregoing of some benefit which a party could have enjoyed but for the waiver. Waiver may be proved by (1) express declarations, (2) acts and declarations manifesting an intent and purpose not to claim the supposed advantage, or (3) failing to act when action would reasonably have been expected. *See Baird v. Fidelity-Phenix Fire Ins. Co.*, 178 Tenn. 653, 665, 162 S.W.2d 384, 389 (Tenn. 1942); *Stovall of Chattanooga, Inc. v. Cunningham*, 890 S.W.2d 442, 444 (Tenn. Ct. App. 1994). With an eye toward reality, courts have recognized in commercial disputes that

> a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future.

*Hospital Computer Sys. Inc. v. Staten Island Hosp.*, 788 F. Supp. 1351, 1357 (D.N.J. 1992).

The only statement or conduct attributable to Bosch that can arguably have constituted a declaration of waiver was the ambiguous line in its president's September 2, 1994 letter to Duffy Tool stating, ". . . BG agreed not to sue Duffy Tool relative to the transactions involved on the tooling issue and in making a transition." Duffy Tool does not insist that this letter was an express declaration of waiver, and the trial court, who heard both sides' evidence expressly rejected any stronger characterization of it as an enforceable covenant not to sue. We agree and find no express waiver.

Duffy Tool points to Bosch's actions during the second half of 1994 as a course of conduct manifesting Bosch's intention to waive its breach of contract claim. However, the most realistic reading of the record, in our view, is that Bosch's first concern in the second half of 1994 was its ability to honor its contract with Ford to supply air conditioner motors. Bosch accepted Duffy Tool's modified contract performance, while it was bringing Pax Machine online as a new supplier. Once it had Pax Machine in place as an alternate parts supplier, Bosch's conduct makes evident that it had several scores yet to settle with Duffy Tool.

After Duffy Tool's last parts shipment, it seems plain to us that Bosch exercised some "self-help" on its breach of contract claim simply by declining to pay Duffy Tool's final invoice. Bosch's answer and counterclaim frankly admit as much. Maybe that would have ended this contract dispute, except Duffy Tool would not let the sleeping dog lie. When Duffy Tool sued to collect its invoice, Bosch promptly and unhesitatingly asserted its breach of contract claim in full. Just because Bosch did not dash to the courthouse and sue first does not mean that Bosch's temporarily reigned-in discontent rises to the level of legal waiver. For us to find waiver-by-conduct on this case's facts would only foment litigiousness in commercial disputes. Accordingly, we find no waiver in Bosch's course of conduct.

### III.
#### MODIFICATION OF THE ORIGINAL CONTRACT

Duffy Tool also asserts that it cannot be liable for breach of the original contract because the parties agreed to modify that contract in mid-1994 to allow Duffy Tool to substitute reduced performance. The trial court rejected this argument on grounds that Bosch was under economic duress in July 1994 when it consented to accept a reduced performance. Duffy Tool now challenges that conclusion. For the purposes of this appeal, we will review the trial court's understanding and application of the legal doctrine of economic duress de novo, *see Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998), but we will presume that the trial court's underlying factual determinations on this issue are correct unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *Branum v. Akins*, 978 S.W.2d 554, 557 (Tenn. Ct. App. 1998).

## A.

Commercial parties are undoubtedly free to modify their contracts consensually. *See* Tenn. Code Ann. § 47-2-209 (1996). Modifications of contracts governed by the Uniform Commercial Code are subject to the general obligation of good faith, which the Code defines as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Tenn. Code Ann. § 47-2-103(1)(b) (1996). Thus, a modification of a contract for the sale of goods procured under circumstances of economic duress is voidable by the victim. *See Cumberland & Ohio Co. of Tex., Inc. v. First Am. Nat'l Bank*, 936 F.2d 846, 850 (6th Cir. 1991); *Exum v. Washington Fire & Marine Ins. Co.*, 41 Tenn. App. 610, 620, 297 S.W.2d 805, 809 (1955).

The sort of economic duress that will render a contract voidable is the "imposition, oppression . . . or taking of undue advantage of the business or financial stress or extreme necessities . . . of another . . . [so] that the party profiting thereby has received money, property or other advantage [that in equity the party] ought not be permitted to retain." *Johnson v. Ford*, 147 Tenn. 63, 92-93, 245 S.W. 531, 539 (1922). Tenn. Code Ann. § 47-1-103 (1996) preserves the applicability of economic duress as a defense in dealings between commercial actors. As a general matter, economic duress will make an agreement voidable by the strapped party when that party's assent has been induced by an "improper threat by the other party that [has left] the victim no reasonable alternative." Restatement (Second) Contracts § 175(1) (1981).[4]

In this case, Duffy Tool's conduct was more than a mere threat to refuse to deliver plates. In June 1994, Duffy Tool unilaterally informed Bosch that it would discontinue supplying mounting plates in six weeks even though approximately two years remained on its contract.[5] At trial, Duffy Tool's president endeavored to downplay Duffy Tool's notification as a mere "request" to be released from the contract. Far from being a request, however, it was a renouncement of the contract. The weight of the evidence makes plain that when Bosch subsequently demanded that Duffy Tool perform the contract without modification, Duffy Tool rebuffed Bosch with "[t]hat decision has already been made."

---

[4]One of the examples used by the American Law Institute to illustrate the use of economic duress to induce an increase in the price of goods is strikingly similar to the facts of this case:

> A, who has contracted to sell goods to B, makes an improper threat to refuse to deliver the goods to B unless B modifies the contract to increase the price. B attempts to buy substitute goods elsewhere but is unable to do so. Being in urgent need of the goods, he makes the modification. B has no reasonable alternative. A's threat amounts to duress, and the modification is voidable by B.

Restatement (Second) Contracts, § 175, illustration 5.

[5]Duffy Tool's lengthy argument that there could be no economic duress because Duffy Tool sought a contract modification in good faith does not fit this case's facts. In June 1994 Duffy Tool did more than merely request a contract modification. It flatly informed Bosch, "Duffy Tool & Stamping will be able to provide mounting flange[s] . . . for six more weeks. As a result, the confirmation of a new vendor must be done as soon as possible." Duffy Tool's statement amounted to an anticipatory repudiation of the parties' contract.

Bosch's vice president of engineering described quite succinctly the predicament Bosch found itself in at the July 8, 1994 meeting with Duffy Tool. He explained that "without those mounting plates we could not have delivered the product.... The alternatives were to continue getting mounting plates from Duffy Tool or to stop the supply of [air conditioner] motors to Ford if we would not have gotten the mounting plates from Duffy Tool." He continued that "[i]f we would have stopped the production of motors with this mounting plate to Ford, we would have stopped a Ford assembly plant because we were the only or the sole supplier for that motor to Ford, so the cars would not have been produced." Noting that failing to supply in the automotive industry is the "biggest sin you can commit," he explained that "I was in a position where I felt I was against the wall or had a gun to my head and had to agree to a compromise to be able to continue getting mounting plates."

Having reviewed the record and considered both sides' arguments, we hold that the trial court correctly determined that the doctrine of economic duress applied to the facts of this case. We also hold that the evidence does not preponderate against the trial court's conclusion that Bosch was acting under economic duress when it consented to a reduced performance by Duffy Tool at the July 8, 1994 meeting.

## B.

Duffy Tool argues that even if economic duress forced Bosch to agree to modify the original contract, Bosch later waived its economic duress defense or, in the alternative, that Bosch ratified the modified agreement after the duress had ceased. We reject these arguments because the record shows that Bosch acted timely in asserting its economic duress defense once Duffy Tool commenced litigation.

Duffy Tool's complaint does not allege that its last shipment of mounting plates was delivered under a modified agreement. Instead, Duffy Tool expressly sued for an unpaid balance "on an open purchase account as evidenced by Invoices." The parties only settled into opposing legal theories of contract modification and economic duress as the litigation progressed. Once Duffy Tool attempted to blunt Bosch's countersuit by asserting consensual modification, Bosch promptly responded by asserting economic duress. We find no waiver.

We reach the same conclusion with regard to Duffy Tool's ratification theory. A party may, without question, ratify a voidable contract. *See Brandon v. Wright*, 838 S.W.2d 532, 534 (Tenn. Ct. App. 1992); *Valley Fidelity Bank & Trust Co. v. Cain Partnership Ltd.*, 738 S.W.2d 638, 639 (Tenn. Ct. App. 1987). Thus, a victim of economic duress who, over a significant time, accepts the benefits flowing from a voidable contract may be deemed to have ratified the contract. *See Carlile v. Snap-on Tools*, 648 N.E.2d 317, 324 (Ill. App. Ct. 1995); *Niosi v. Niosi*, 641 N.Y.S. 2d 93, 94-95 (App. Div. 1996). However, a finding of ratification hinges on proof of the party's intent to operate under the voidable arrangement, manifested once the party is free from duress. *See United States v. McBride*, 571 F. Supp. 596, 613 (S.D. Tex. 1983).

We should keep in mind that when great pressure exists and when the time for performance is short, it is neither uncommon nor unreasonable for commercial actors to wait until the pressure has passed before asserting a breach of contract claim. *See, e.g., Garcia v. Kastner Farms, Inc.*, 789 S.W.2d 656, 659-60 (Tex. App. 1990) (finding no ratification of an alleged modification). Additionally, before reading an intent to ratify into a party's conduct, we should be sure that the conduct is not ambiguous. Ordinarily, conduct evidencing ratification should be inconsistent with anything other than approval of the contract. *See Page v. Woodson*, 200 S.W.2d 768, 771 (Ark. 1947); *Kennedy v. Roberts*, 75 N.W. 363, 366 (Iowa 1898).

We find *Hassett v. Dixie Furniture Co.,* 425 S.E.2d 683 (N.C. 1993) instructively similar to this case on this issue. In that case, a furniture designer entered a four-year contract to provide exclusive design services to a furniture manufacturer. The manufacturer later decided that the designer was not living up to the contract and sent the designer a termination agreement providing that the manufacturer would pay the designer for a limited future period in lieu of paying the designer for the rest of the contract's term. The designer refused to sign the termination agreement because it contained terms he had not agreed to. Thereafter, the manufacturer paid the designer for the limited period defined in the termination agreement and then hired other designers. When the designer sued for breach of the original four-year contract, the manufacturer contended that he had ratified the termination agreement by accepting payments under it. The designer countered that he was entitled to those same payments under the original contract and that he had accepted them under that contract which was still in its time of performance. He argued that he should not be required to refuse a performance otherwise contractually due him at the risk of being held to have agreed to a modification. The North Carolina Supreme Court agreed with the designer and held that for a party to merely accept benefits already due was conduct too ambiguous to support ratification of a subsequent contract modification. *See Hassett v. Dixie Furniture Co.*, 425 S.E.2d at 687.

In this case, Duffy Tool asserts that Bosch ratified a modification of the parties' contract by accepting its continued performance after the July 1994 meeting. We disagree. From July 1994 through December 1994, Bosch got from Duffy Tool just what Duffy Tool was originally obligated by contract to supply – air conditioner motor mounting plates. Bosch took what plates it could get for as long as it could get them. When Duffy Tool stopped supplying plates, Bosch considered Duffy Tool in breach, and after Pax Machine was in place as a supplier and the duress removed, Bosch asserted breach. We agree with the analysis in *Hassett v. Dixie Furniture Co.* and find Bosch's conduct in accepting mounting plates from July to December 1994 entirely too ambiguous to support a finding of ratification.

## IV.
### THE CALCULATION OF BOSCH'S DAMAGES

The remaining issues before us relate to the trial court's calculation of Bosch's damages. Duffy Tool asserts that the damage award is flawed because it leaves Bosch in a better situation than Bosch would have been in had Duffy Tool not breached its contract. Specifically, Duffy Tool takes issue with the decision to award damages for Pax Machine's tooling charge, for the difference between Duffy Tool's and Pax Machine's price per mounting plate, and the difference between Duffy Tool's tooling charge and Pax Machine's tooling charge. We find that the trial court properly determined that Bosch was entitled to damages stemming from Duffy Tool's breach. However, we have determined that the trial court erred by including in those damages (1) the increased cost of the mounting plates supplied after January 1995, (2) the difference in the tooling charges, and (3) the entire cost of Pax Machine's tooling charge.

## A.

Bosch's original contract with Duffy Tool obligated Bosch to pay $.50 per mounting plate for all mounting plates through May 31, 1996. The contract also contained a material adjustment clause permitting Duffy Tool to obtain prospective price adjustments due to increases in the costs of material.[6] As it turned out, the price of the steel used to fabricate the mounting plates increased on an industry-wide basis between July 1993 and July 1994.

Duffy Tool would have been entitled to invoke the material adjustment clause during the first quarter of 1995. However, after Bosch requested it to continue supplying mounting plates until a replacement supplier could be found, Duffy Tool demanded an immediate price increase to offset its increased steel costs even though it would not otherwise have been entitled to request this price increase for six months. Duffy Tool also made it clear that it would not continue to supply mounting plates, even on a temporary basis, unless Bosch agreed to the immediate price increase. Bosch acceded to Duffy Tool's demands and agreed to pay $.55 for each mounting plate effective July 11, 1994.

In the latter half of 1994, Bosch contracted with Pax Machine to take over the production of the mounting plates. This contract obligated Bosch to pay Pax Machine $.55 per mounting plate as well as $134,850 for the new tooling. Unlike the contract with Duffy Tool, Bosch's contract with Pax Machine was open-ended and was not limited to the remaining term of its original contract with Duffy Tool. Pax Machine continued to supply Bosch with mounting plates after the term of the original Duffy Tool contract and was still shipping mounting plates at the time of trial. The record contains no evidence that Bosch ever intended to stop procuring mounting plates from Pax Machine.

## B.
### DAMAGES BASED ON THE DIFFERENCE IN THE COST OF THE MOUNTING PLATES

---

[6]The clause stated: "Material adjustments may be submitted during the first quarter of each calendar year with actions being for the upcoming year."

We take up first the trial court's decision to award Bosch the difference between the price Bosch paid Pax Machine for the mounting plates after February 1995 and the price it would have paid Duffy Tool for the same mounting plates for the same period. This issue touches fundamentally on the correct measure of damages in this case.

The primary purpose of assessing damages in breach of contract cases is to put the non-breaching party in the same position the party would have been in had the contract been performed. *See Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993); *Hennessee v. Wood Group Enters., Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991). The law's aim is not to restore the party to the position it would have been in had there never been a contract but rather to give the non-breaching party the benefit of its bargain. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.2(1), at 23 (2d ed. 1993). To do that, the law puts an expectancy value on the contracted-for performance that is not received. The normal measure of that expectancy value is the non-breaching party's cost incurred in getting a substitute performance. *See* Dobbs, *Law of Remedies* § 12.2(1), at 25.

When a contract involves the sale of goods, Tennessee's version of the Uniform Commercial Code provides buyers with two alternative remedies against sellers who fail to deliver the goods. First, the buyer may recover economic loss measured by the difference between market price for the goods and the contract price. *See* Tenn. Code Ann. § 47-2-713(1) (1996). Second, the buyer may "cover" by seasonably procuring substitute goods and then seek the difference between the cover and the contract price. *See* Tenn. Code Ann. § 47-2-712(1) (1996); *see also Productora E Importadora De Papel v. Fleming*, 383 N.E.2d 1129, 1137 (Mass. 1978); *Lewis v. Nine Mile Mines, Inc.*, 886 P.2d 912, 915 (Mont. 1994). These remedy provisions mesh neatly with the general principles of contract damages. They are intended to put the aggrieved party in as good a position as if the other party had fully performed the agreement. *See* Tenn. Code Ann. § 47-1-106(1) (1996); *G.A. Thompson and Co., Inc. v. Wendell J. Miller Mortgage Co., Inc.*, 457 F. Supp. 996, 999 (S.D.N.Y. 1978).

The cover remedy of Tenn. Code Ann. § 47-2-712 is one of the Uniform Commercial Code's innovations. *See* 1 Roy R. Anderson, *Damages Under the Uniform Commercial Code* § 7:06 (1992). Cover is a buyer's timely and reasonable purchase of or contract to purchase substitute goods. *See* Tenn. Code Ann. § 47-2-712(1); *In re Fran Char Press, Inc.*, 55 B.R. 55, 57 (Bankr. E.D.N.Y. 1985). As used in the remedies section of the Uniform Commercial Code, the cost of cover may be thought of as the cost difference between the desired item sold by the original seller and the equivalent item's cost sold by a replacement seller. *See generally In re Lifeguard Indus., Inc.*, 42 B.R. 734, 738 (Bankr. S.D. Ohio 1983). A buyer is not required to cover the seller's nonperformance, but if the buyer does so, the measure of damages for the seller's breach is the difference between the cost of cover and the parties' original contract price, *see* Tenn. Code Ann. § 47-2-712(2); 3 Mary A. Foran, *Williston on Sales* § 25-27 (5th ed. 1996), rather than the market price formula in Tenn. Code Ann. § 47-2-713. *See* Tenn. Code Ann. § 47-2-713 cmt. 5; 1 Anderson, § 7:06.

The trial court awarded Bosch $38,268.93 for the difference between the amount Bosch paid Pax Machine for plates and the amount it had contracted to pay Duffy Tool for the same plates from the start of Pax Machine's performance through the original contract's expiration date. Duffy Tool asserts that this award effectively enables Bosch to obtain mounting plates for the duration of the original contract at a lower price than Bosch would have paid under the original contract. Pax Machine began supplying plates in February 1995 for $.55 per plate – the same price that Duffy Tool would have been permitted to charge Bosch had the original contract been modified in accordance with the material adjustment clause. Therefore, Duffy Tool argues that Bosch has not shown that it paid Pax Machine any more in cover for the same period had the original contract continued according to its terms. Duffy Tool's argument on this score has merit.

Under Tenn. Code Ann. § 47-2-712(2), Bosch was only entitled to the cost of its cover measured by the price difference between the plates to be supplied by Duffy Tool and the same plates ultimately provided by Pax Machine. We agree with Duffy Tool that Bosch did not demonstrate that it paid Pax Machine any more for the plates than it would otherwise have paid Duffy Tool beginning in 1995 following a price increase based on the material adjustment clause. Consequently, we hold that the trial court improperly awarded damages to Bosch for the higher price of the plates supplied by Pax Machine in the amount of $38,268.93.

Thus far, the discussion relates only to the mounting plates provided by Pax Machine from February 1995 through the duration of the original contract. We must still address the cost of the plates provided by Duffy Tool between July 11, 1994 when it demanded and received a ten percent price increase and December 1994 when it shipped its last mounting plates to Bosch. The trial court determined that Duffy Tool was not entitled to recover for the increased price of these mounting plates and accordingly reduced Duffy Tool's damages by $9,404. We agree with this damage calculation.

Duffy Tool had already informed Bosch that it would not continue to perform under the contract when it demanded the ten percent price increase from Bosch. Thus, Bosch was under economic duress at the very time that Duffy Tool demanded the price increase. Duffy Tool's demand for a price increase, coming as it did in mid-1994, was premature because the contract required that material adjustments "be submitted during the first quarter of each calendar year with actions being for the upcoming year." Duffy Tool, however, decided to use Bosch's predicament to its own advantage and told Bosch that it would not even consider supplying mounting plates on a short-term basis unless Bosch agreed to an immediate ten percent price increase.

The record contains ample evidence to support a conclusion that Bosch paid Duffy Tool an increased price for the mounting plates from July through December 1994 because of a contract modification induced by economic duress brought on by Duffy Tool's breach of contract. Had the contract been performed according to its terms, Duffy Tool would not

have been entitled to the ten percent price increase until early 1995. Accordingly, the trial court properly credited the $9,404 to Bosch in order to place Bosch in the same position it would have been in had Duffy Tool honored the terms of the original agreement.

## C.
### DAMAGES BASED ON PAX MACHINE'S TOOLING COSTS

Duffy Tool also takes issue with the portion of the damage award based on the additional $134,850 Bosch paid to Pax Machine for the tooling needed to perform the contract. This particular calculation was problematic for the trial court. In its initial decision, the trial court awarded Bosch $140,000 for Duffy Tool's tooling costs[7] and an additional $134,850 for Pax Machine's tooling costs. The trial court later informed the parties that it had reconsidered this award. Instead of granting Bosch a $140,000 set-off, the trial court determined that Bosch should receive a $5,150 set-off based on the difference between Duffy Tool's tooling charge and Pax Machine's tooling charge.[8] We have determined that the trial court correctly awarded Bosch damages based on Pax Machine's tooling charge. However, we have determined that the trial court erred by awarding Bosch the $5,150 set-off and by calculating these damages based on the entire amount of Pax Machine's tooling charge.

Tenn. Code Ann. §§ 47-2-712(1), (2) and 47-2-715(1) (1996) allow buyers to recover incidental damages from breaching sellers. These damages may include any commercially reasonable expenses incurred in connection with securing substitute goods. *See Simeone v. First Bank Nat'l Assoc.*, 73 F.3d 184, 190 (8th Cir. 1996); *Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245, 258 (N.D. Ill. 1974). These damages are recoverable on the theory that only by receiving reimbursement for supernumerary costs occasioned by the breach, can a buyer truly receive the benefit of the bargain. To recover incidental damages, the buyer must show (1) that the expenses were incurred incident to the breach and (2) that they were reasonable. *See* 1 Anderson, *Damages Under the Uniform Commercial Code* § 7:09; 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 6-5 (4th ed. 1995).

We expected to find more evidence regarding the nature of this tooling and its expected useful life. The record contains no evidence about the ownership and control of the tooling and little evidence regarding its useful life or its ability to be recycled. There is likewise no evidence regarding how long Bosch anticipated it would use the mounting plates made by this tooling. Duffy Tool does not seriously assert, however, that an alternative supplier would not have been required to prepare and install new tooling in order to supply

---

[7]This award was in the form of a $140,000 off-set against the amount Bosch owed to Duffy Tool for the final delivery of mounting plates.

[8]$140,000 − $134,850 = $5,150.

these mounting plates[9] or that the amount Pax Machine charged Bosch for its tooling was unreasonable.

Duffy Tool's main challenge to awarding Bosch damages based on Pax Machine's tooling charge is "the result . . . is that Bosch pays for tooling only once." This argument misses the point that Bosch should only have been required to pay for tooling once during the term of the original contract. The $140,000 Bosch originally paid to Duffy Tool to develop the tooling required to perform the contract was this payment. The $134,850 Bosch later paid to Pax Machine to develop the tooling to perform the balance of the original contract should never have been necessary. Indeed, Bosch would have been spared its entire tooling outlay to Pax Machine had Duffy Tool continued to supply the mounting plates in accordance with the original contract.

Duffy Tool also insists that Bosch should not be permitted to recover Pax Machine's tooling charge because Bosch would have been required to purchase new tooling at the end of the term of the original three-year contract. This argument has some evidentiary basis in light of the proof that Duffy Tool would not have extended the original contract beyond its three-year term in light of its continuing difficulties with Bosch. Accordingly, Bosch would have been required to locate another supplier in June 1996, and this new supplier would have charged Bosch another tooling fee.

This factual conclusion does not, however, undermine the entire damage award based on Pax Machine's tooling charge. Duffy Tool's breach forced Bosch to make an additional expenditure for tooling approximately eighteen months prematurely. Accordingly, Bosch is entitled to recover damages for the additional tooling expenses it incurred during the term of the original contract. It is not, however, entitled to recover damages for tooling expenses more properly allocable to production after the term of the original three-year contract. Thus, a proration of Pax Machine's $134,850 tooling charge was in order.

Prorating these damages would have been a relatively easy matter had Bosch's contract with Pax Machine been for a definite term or had the record contained evidence concerning the useful life of the tooling. In the absence of proof, we will not assume that Pax Machine's tooling could have been used indefinitely without being replaced. Likewise, because Pax Machine continued to supply mounting plates to Bosch after May 1996, we will not assume that the tooling became unusable at the end of the term of Duffy Tool's original contract with Bosch. Rather, we will prorate these damages based on the assumption that the

---

[9]Only one of the alternative suppliers contacted by Bosch indicated that it would consider using the tooling that Duffy Tool had been using. However, while this supplier offered a credit to Bosch if it could acquire the tooling that Duffy Tool had been using, its net price per mounting plate would have still been higher than the price per plate offered by Pax Machine.

duration of Pax Machine's contract was functionally the same as the duration of Duffy Tool's original contract – three years.[10]

Pax Machine supplied Bosch with mounting plates for the seventeen months remaining on Duffy Tool's contract. Accordingly, Bosch is entitled to recover the costs it incurred to obtain substitute tooling for those seventeen months. Because we have determined that Pax Machine's tooling charge should be spread over thirty-six months, Bosch is entitled to recover seventeen thirty-sixths of Pax Machine's tooling charge or $63,679.[11]

In addition to the tooling expense, the trial court awarded Bosch a $5,150 set-off, in the trial court's words, "representing the difference in the amount Bosch paid to Duffy Tool for tooling and the amount Bosch paid to cover for Duffy Tool's breach . . .." This difference is not an incidental expense related to Bosch's cover and should not have been part of the damage calculation. Bosch is entitled to recover only that portion of Pax Machine's tooling expense that is properly allocable to Pax Machine's performance of the work that Duffy Tool would have performed had it not breached the original contract. That way, Bosch only has to pay once for the tooling needed during the term of the original contract term, and Duffy Tool is not required to foot the expense for the tooling after July 1996.

## V.

We affirm the trial court's conclusion that Duffy Tool is entitled to recover for Bosch's failure to pay its final invoice and that Bosch is entitled to damages for Duffy Tool's breach of its supply contract. In accordance with this opinion, we calculate the damages as follows:

Bosch's Cover Damages

| | | |
|---|---|---|
| 1. 17/36 Pax Machine tooling charge | $ 63,679 | |
| 2. Extra pre-1995 charges | 9,404 | |
| | Total Cover Damages | $ 73,083 |

| | | |
|---|---|---|
| Duffy Tool's Final Invoice | $ 58,752 | |
| Bosch's Set-offs | | |
| 1. Sorting | (1,982) | |
| 2. Defective Parts | (2,640) | |
| | Total Unpaid Invoice | $ 54,130 |
| | TOTAL | $ 18,953 |

---

[10]Duffy Tool could have presented evidence showing that the useful life of Pax Machine's tooling was longer than three years. It did not do so. By the same token, Bosch could have presented evidence concerning the duration of its contract with Pax Machine, its future use of the mounting plate, or the life expectancy of the tooling.

[11]$134,850 x 17/36 = $63,679.

Accordingly, we remand the case to the trial court with directions to enter a judgment in favor of Bosch and against Duffy Tool for $18,953 together with prejudgment interest at the statutory rate from October 28, 1996, the date of the entry of the final judgment by the trial court. We also tax the costs of this appeal in equal proportions to Duffy Tool & Stamping, Inc. and its surety and to Bosch Automotive Motor Systems Corporation for which execution, if necessary, may issue.


_____
WILLIAM C. KOCH, JR., JUDGE


CONCUR:


_____
HENRY F. TODD,
PRESIDING JUDGE, M.S.


_____
BEN H. CANTRELL, JUDGE